UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

WILLIAM D. THOMAS,

                                        Plaintiff,

             v.                                          9:17-cv-00425
                                                         (DNH/TWD)

MARK KINDERMAN and
MICHAEL JANOCHOWSKI,

                                        Defendants.
———————————————————————————

APPEARANCES:                                    OF COUNSEL:

WILLIAM D. THOMAS
Plaintiff, *pro se*
13-A-2123
Downstate Correctional Facility
Box F
Fishkill, New York 12524

HON. ERIC T. SCHNEIDERMAN               TIMOTHY P. MULVEY, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## REPORT-RECOMMENDATION AND ORDER

## I.    INTRODUCTION

        This *pro se* civil rights action has been referred to the Court for Report and

Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28

U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3(c).  Plaintiff

William D. Thomas, an inmate in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS"), commenced this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights while confined at Marcy Correctional Facility ("Marcy") in 2015.  (Dkt. No. 1.)  Plaintiff's Eighth Amendment excessive force claim against Corrections Officer ("C.O.") Michael Janochowski and Fourteenth Amendment due process claim against Deputy Superintendent ("Supt.") Mark Kinderman survived initial review.  (Dkt. No. 13.)

Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 18.)  Plaintiff has not opposed Defendants' motion despite the Court *sua sponte* granting an extension of time within which to do.  (Dkt. No. 24.)  For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

## II.    FACTUAL BACKGROUND

On July 26, 2015, Plaintiff was assaulted by C.O. Janochowski.  (Dkt. No. 1 at 6.[1])  Disciplinary charges were placed against Plaintiff regarding this incident.  *Id*.  On September 2, 2015, a Tier III disciplinary hearing was conducted by Deputy Supt. Kinderman.  *Id*. at 4.  During the hearing, Plaintiff was denied the opportunity to present evidence and to call witnesses in his defense.  *Id*.  At the conclusion of the hearing, Deputy Supt. Kinderman found Plaintiff guilty of misbehavior and sentenced him to one hundred twenty days confinement in the special housing unit ("SHU").  *Id*. at 5.  Plaintiff attempted to appeal the disciplinary determination on September 5, 2015, but his appeal papers were "never processed" by "the mailroom."  *Id*. at 6.

---

[1]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

### III.   LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[2] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified

---

[2] The Court finds that Plaintiff's complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 1 at 7.)

complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[3] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by

---

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When a party fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the moving party. *See id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

## IV.    ANALYSIS

Plaintiff claims that he was subjected to cruel and unusual punishment and denied procedural due process while confined at Marcy in 2015, in violation of the Eighth and Fourteenth Amendments. (Dkt. No. 1.) Defendants seek summary judgment on the ground that Plaintiff did not exhaust his administrative remedies. (Dkt. No. 18-4.)

### A.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that

exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Id*. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted).

"Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process." *Harvey v. Harder*, No. 9:09-CV-154 (TJM/ATB), 2012 WL 4093792, at *4 (N.D.N.Y. July 31, 2012) (citing *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007)), *report-recommendation adopted by*, 2012 WL 4093760; *see also Rosales v. Bennett*, 297 F. Supp. 2d 637, 639 (W.D.N.Y. 2004) (discussing the difference between the grievance process and the administrative appeals process for disciplinary or administrative segregation appeals). Indeed, "an individual decision or disposition resulting from a disciplinary proceeding . . . is not grievable." N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.3(e)(2).

To the extent a civil rights claims must be exhausted by utilizing the facility's grievance process, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). *Id*. § 701.5. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. *Id*. § 701.5(a)(1). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the

grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

There are special procedures that may be used for staff misconduct.  *Id*. § 701.8.  A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days.  *Id*. § 701.8(f).  If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision.  *Id*. § 701.8(h).  CORC is required to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can—and must—be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

However, when an inmate presents a claim arising "directly out of a disciplinary or administrative segregation hearing . . . (e.g., a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d at 413 (internal quotation marks and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009) (holding that inmate's appeal of a disciplinary determination "constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court"). Section 254.8 provides, in relevant part, that:

> Any inmate shall have the right to appeal the disposition of any superintendent's hearing, to which he was a party, to the

> commissioner within 30 days of receipt of the disposition.  The
> commissioner or his designee shall issue a decision within 60 days
> of receipt of the appeal.  The commissioner or his designee may:
>> (a) affirm the hearing disposition;
>> (b) modify the hearing disposition by dismissing certain
>> charge(s) and/or reducing the penalty imposed;
>> (c) reverse the hearing disposition; or
>> (d) reverse the hearing disposition and order a new hearing.

N.Y.C.R.R. § 254.8.

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted)).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id*. at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id*. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id*.  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"  829 F.3d 118, 123 n.2 (2d Cir. 2016).  The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements.  *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  Plaintiff must then establish that the relevant exhaustion procedure was unavailable to him under *Ross*.

**B.    Plaintiff's Excessive Force Claim**

Plaintiff alleges C.O. Janochowski assaulted him on July 26, 2015.  (Dkt. No. 1 at 4.)  Defendants contend Plaintiff's Eighth Amendment excessive force claim should be dismissed for failure to exhaust administrative remedies.  (Dkt. No. 18-4 at 4-7.)

According to Rachael Seguin, Assistant Director of the IGP for DOCCS and custodian of the records maintained by CORC, CORC records reveal that Plaintiff did not submit any grievance appeals to CORC in 2015.  (Dkt. No. 18-2 at ¶¶ 4, 11.[4])  As such, the Court finds Defendants have adequately supported the affirmative defense of failure to exhaust as to Plaintiff's Eighth Amendment excessive force claim against C.O. Janochowski.  *See, e.g.*, *Bennett v. Onua*, No. 09-cv-7227 (SAS), 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed).

---

[4]  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record in this case. Here, the record is devoid of any evidence that Plaintiff's administrative remedies regarding his Eighth Amendment excessive force claim against C.O. Janochowski were not "available" under *Ross*.

Based on the foregoing, the Court recommends that C.O. Janochowski be granted summary judgment on Plaintiff's Eighth Amendment excessive force claim on the grounds that Plaintiff has failed to exhaust his administrative remedies and has not shown that those remedies were unavailable to him.

Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004). However, if a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. *Id.* at 86; *see Hilbert v. Fischer*, No. 12 Civ. 3843(ER), 2013 WL 4774731, at

*7 (S.D.N.Y. Sept. 4, 2013) (collecting cases).  Here, the time for Plaintiff to exhaust the alleged

July 26, 2015, incident against C.O. Janochowski has long since expired.  Therefore, the Court

recommends dismissing Plaintiff's Eighth Amendment excessive force claim against C.O.

Janochowski with prejudice.

      C.       **Plaintiff's Due Process Claim**

     Plaintiff alleges he was denied due process during his Tier III disciplinary hearing

conducted by Deputy Supt. Kinderman.  (Dkt. No. 1 at 5.)  Specifically, Plaintiff claims Deputy

Supt. Kinderman denied him the right to call witnesses and to present evidence in his defense.

*Id*.  (Dkt. No. 1 at 5.)  Defendants contend Plaintiff's Fourteenth Amendment due process claim

should be dismissed for failure to exhaust administrative remedies.  (Dkt. No. 18-4 at 4-7.)

     In support of their motion, Defendants rely on Seguin's declaration and argue Plaintiff

did not appeal "any inmate grievance against [Deputy Supt.] Kinderman . . . to the CORC."

(Dkt. No. 18-1 at ¶ 5.)  However, as discussed above, "disputes stemming from a disciplinary

hearing are properly appealed directly and not through the [IGP]."  *Samuels v. Selsky*, No.

01CIV.8235(AGS), 2002 WL 31040370, at *8 (S.D.N.Y. Jan. 23, 2003); *see, e.g.*, *Flanagan v.

Maly*, No. 99 CIV 12336 GEL, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002) ("When an

inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he

exhausts his administrative remedies by presenting his objections in the administrative appeals

process, not by filing a separate grievance instead of or in addition to his ordinary appeal.").

Thus, DOCCS "has a *separate and distinct* administrative appeal process for inmate misbehavior

hearings . . . ."  *Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *2

(N.D.N.Y. Mar. 31, 2010).  Because Defendants' submission is silent as to whether or not

Plaintiff appealed Deputy Supt. Kinderman's disciplinary disposition, the Court finds Defendants have failed to satisfy their burden that Plaintiff failed to meet the exhaustion requirements.

Additionally, as discussed above, the plain language of the PLRA requires only "available" administrative remedies to be exhausted. *See* 42 U.S.C.1997e(a); *see also Ross*, 136 S. Ct. at 1859. In his verified complaint, Plaintiff claims that unnamed mailroom staff failed to "process" his disciplinary appeal on September 5, 2015. (Dkt. No. 1 at 6.) The Court notes that Defendants have put forth no evidence whatsoever to counter Plaintiff's claim that he was prevented from filing his administrative appeal on September 5, 2015.

Based upon the foregoing, the Court recommends that Deputy Supt. Kinderman be denied summary judgment on Plaintiff's Fourteenth Amendment due process claim for failure to exhaust administrative remedies. However, inasmuch as no discovery has been conducted, the Court recommends summary judgment be denied without prejudice. In so recommending, the Court expresses no opinion as to the availability of Plaintiff's administrative remedies or the merits of Plaintiff's Fourteenth Amendment due process claim against Deputy Supt. Kinderman.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 18) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendant C.O. Janochowski; and it is further

**RECOMMENDED** that Plaintiff's Eighth Amendment excessive force claim against Defendant C.O. Janochowski be **DISMISSED with prejudice** for failure to exhaust; and it is further

**RECOMMENDED** that summary judgment be **DENIED without prejudice** to

Defendant Deputy Supt. Kinderman; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation at <u>Downstate Correctional Facility and Auburn Correctional Facility,</u>[5] along

with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557

F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the

Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL</u>**

**<u>PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated:  December 4, 2017
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[5]  *See* Dkt. Nos. 23, 25.

[6]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]     Given my duty to liberally construe a *pro se*
        plaintiff's civil rights complaint, I construe Plaintiff's
        Amended Complaint as including a claim that
        various Defendants violated Plaintiff's rights under
        the Fourth Amendment to be free from unreasonable
        searches and seizures. *See Phillips v. Girdich,* 408
        F.3d 124, 130 (2d Cir.2005) ("We leave it for the
        district court to determine what other claims, if any,
        [the plaintiff] has raised. In so doing, the court's
        imagination should be limited only by [the plaintiff's]
        factual allegations, not by the legal claims set out
        in his pleadings.") [citations omitted]. *(See also*
        Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
        Defendants Woods and Holt "violat[ed] plaintiff's
        4th ... Amendment[ ] rights"], ¶ 15 [alleging that

Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in

Case 9:17-cv-00425-DNH-TWD    Document 26    Filed 12/04/17    Page 17 of 106
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

---

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

---

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

[6]    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P. 56(c)* ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

[7]    *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

[8]    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

[9]    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[10]    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

[11]    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4**    Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

[12]    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

[13]    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

2006 WL 1133247

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to **hold a copy of the complaint"** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents **being in my possession ...** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]  (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]  (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]  (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

## Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]  (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]  (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]  (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]  (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

2006 WL 1133247

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21       (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. 22

22       (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. 23 In pertinent part, the letter stated,

23       (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already tied both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. 24

24       (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. 25

25       (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

*6 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. 26 In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." 27 In addition, the last page of the letter states:

26       (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]
    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[28]

[28]
    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]
    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

#### Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."[31]

[30]
    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]
    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."[33]

[32]
    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]
    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."[34]

[34]
    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[35] The note stated, in pertinent part:

[35]
    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

[45]    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

## Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

[47]    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [51]

[49]    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

[50]    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

[51]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

[53]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

[54]    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (*Id.*)

59    (*Id.*)

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood.[67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU.[68]

[66]    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty

right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]   *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks

before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]   (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]   (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]   (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without

providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    (*See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense

counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in *Paragraph 15* of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." 78

76    (*See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites

the Fourth Amendment], 28 [in which defense counsel
asked, "Are you alleging that the facts in paragraph
15 give rise to a constitutional claim for search and
seizure?" and Plaintiff answered, "Yes, ma'am"].)

78    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment
claim is that, even if the search occurred as Plaintiff
alleged, that search was of a prisoner's cell (or
"cube"). "[T]he Fourth Amendment proscription against
unreasonable searches does not apply within the confines
of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526
(1984). [79] Nor does the Fourth Amendment proscription
apply within the confines of a prison "cube." [80] Indeed,
Plaintiff appears to recognize this point of law. [81]

79    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL
      160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff
      thus may assert no cause of action here based on an
      alleged violation of his Fourth Amendment rights.");
      *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.)
      ("Searches of prison cells, even arbitrary searches,
      implicate no protected constitutional rights."), *aff'd,*
      122 F.3d 1055 (2d Cir.1995).

80    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S.
      Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y.
      Dec. 7, 1995) (granting defendants' motion for
      summary judgment, in part because plaintiff had no
      reasonable expectation of privacy, under the Fourth
      Amendment, in his cell, which plaintiff referred to
      as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp.
      609, 611, 613 (W.D.N.Y.1992) (granting defendants'
      motion for summary judgment, in part because
      prison officials have same need, and right, to search
      prisoner's "cell" as his "cubicle").

81    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl.,
      attaching transcript of Plaintiff's deposition, in which
      defense counsel asked, "You have a constitutional
      right to be free from search and seizure as an inmate?"
      and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended
Complaint as asserting a Fourth Amendment claim
against Defendant Woods for (allegedly) unreasonably
searching and seizing various pieces of Plaintiff's outgoing
and incoming mail in August of 2002. However, even
if I did so construe that Amended Complaint, I would
conclude that this Court would not have subject matter
jurisdiction over that claim. The only portion of Plaintiff's
Amended Complaint that regards such a search and

seizure by Defendant Woods of Plaintiff's mail is
vague and conclusory. [82] Even taking as true Plaintiff's
allegations, the mail in question consisted of clearly
identifiable contraband (e.g., legal materials belonging to
Inmate Alcivar in packages to, or from, persons bearing
the last name of Alcivar). [83] I fail to see how any
search and confiscation of such contraband would have
violated the Fourth Amendment. Indeed, such a search
and confiscation would appear to have been expressly
authorized by DOCS Directive No. 4422 (which regards
the Inmate Correspondence Program). [84]

82    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83    I note that the alleged "interception" by Defendant
      Woods of these packages was preceded by a letter
      from Plaintiff to Woods referring to "documents
      [belonging to Inmate Alcivar] being in [Plaintiff's]
      possession" and referring to Inmate Alcivar's family
      members. Furthermore, I note that the alleged
      contents of these packages would have reasonably
      appeared (at the very least) to consist of contraband
      (i.e., allegedly being the same documents that
      later gave rise to three disciplinary charges against
      Plaintiff, which charges resulted in a conviction that
      was affirmed on appeal).

84    *See, e.g.,* DOCS Directive No. 4422, § III.B.17.
      ("Inmates shall not be permitted to use their
      correspondence privileges to solicit ... services,
      or goods."), § III.G.1. ("All incoming general
      correspondence will be opened and inspected for ...
      photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's
Fourth Amendment claim.

C. Whether Plaintiff Has Failed to Establish (or Even
   State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that
Plaintiff has failed to establish (or even state) an Eighth
Amendment claim because (1) Plaintiff has not established
(or even alleged) a deprivation that is "sufficiently serious"
for purposes of the Eighth Amendment, and (2) he has not
established that Defendants were *deliberately* indifferent
to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at
11, 13-14 [Defs.' Mem. of Law].) Liberally construed,
Plaintiff's response papers argue that (1) he has established
a deprivation that is "sufficiently serious" through his
evidence that he experienced a back injury while in SHU

2006 WL 1133247

as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a

prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

85    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456[25th ed.1990] ).

86    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87    *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he

suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]  (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]  (See, supra, Statement of Fact No. 29.)

*13  More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed before he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]  (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]  (Compare Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on 9/23/02, after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] with Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before 9/13/02, and that the date of diagnosis was 9/20/02] and Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on 9/18/02] and Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on 9/9/02, or three days after his admission to SHU].)

[94]  (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on 9/9/02 containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT in the past. I request a repeat treatment series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was exacerbated by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]  See Faunce v. Gomez, No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); Page v. Kirby, 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); Levi v. District of Columbia, 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") before Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]    (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]    (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely

moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14**  In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed was not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose

decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question.[103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]   (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any

prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[105]

[104]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]   (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

2006 WL 1133247

Plaintiff was 51 years old at the time of this incident; he was been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S.

477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997)].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response.]

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109]    *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect

Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, see, e.g., Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. See Webb v. Goord, 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end." Webb, 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. Id. (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); Boddie v. Schneider, 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. (See, supra, Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no evidence to the contrary. Plaintiff merely argues that DOCS' policies and procedures would never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result,

2006 WL 1133247

I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995)

(citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]    *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]    *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter"

regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt.

No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

1999 WL 983876

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4093792
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gregory HARVEY, Plaintiff,

v.

David HARDER, et al., Defendants.

No. 9:09–CV–154 (TJM/ATB).
|
July 31, 2012.

**Attorneys and Law Firms**

Gregory Harvey, pro se.

Aaron Marcus, Asst. Broome County Atty., for
Defendants.

**ORDER and REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrtate
Judge.

**\*1** This matter has been referred to me for Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights
amended complaint, plaintiff alleges that defendants
violated his rights to due process and equal protection [1]
when they kept him in "segregated housing" for
approximately one month, without any disciplinary
incident or hearing. (Am, Compl .; Dkt. No. 33). Plaintiff
also alleges that defendant Shear improperly ordered
plaintiff to be put in restraints whenever he left his cell.
(*Id.*) Plaintiff seeks substantial monetary relief.

[1]    The amended complaint refers only to "due
       process," however, the plaintiff's response to
       defendants' summary judgment motion mentions
       "equal protection." The court will consider both
       claims in this recommendation.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt.
No. 47). Plaintiff has responded in opposition to the
motion. (Dkt. No. 50). For the following reasons,
this court agrees with defendants and will recommend
dismissal of the amended complaint.

**DISCUSSION**

**I. *Facts and Procedural History* [2]**

[2]    The court must note that plaintiff has filed eight cases
       in the Northern District of New York, only three of
       which are currently pending. *Harvey v. Farber, et al.,*
       9:09–CV–152 (MAD/TWD); *Harvey v. Corrections
       Officers 1 through 6, et al.,* 9:09–CV–154 (LEK/
       TWD); and this case, *Harvey v. Harder,* 9:09–CV–
       154 (TJM/ATB). The cases that are closed are the
       following: *Harvey v. Grow, et al.,* 9:09–CV–518 (GTS/
       RFT); *Harvey v. Sawyer, et al.,* 9:09–CV–598 (FJS/
       DRH); *Harvey v. Luther, et al.,* 9:09–CV–599 (DNH/
       GJD); *Harvey v. City of Utica Police Officers, et al.,*
       9:09–CV–644 (TJM/GHL); and *Harvey v. Law,* 9:10–
       CV–1468 (LEK/DEP). The court understands that at
       the time plaintiff filed his original complaint in this
       action, many of the above cases had not yet been
       filed; however, by the time plaintiff filed his amended
       complaint in March of 2011, *all* of the other cases had
       been filed, but plaintiff continued to list only one case
       on the amended complaint form. (Am.Compl.¶ 5).

Plaintiff alleges that he was improperly placed in
"segregated housing" at Broome County Correctional
Facility ("BCCF") from January 12, 2007 until he was
transferred out of the facility on February 13, 2007.
Plaintiff claims that defendants violated his rights to due
process and equal protection because they did not afford
him a hearing prior to his confinement in the Special
Housing Unit ("SHU"). Plaintiff's original complaint
named only the Broome County Sheriff, David Harder.
(Dkt. No. 1). In his amended complaint, plaintiff added
the names of five more defendants, who plaintiff believes
are responsible for his improper confinement: (1) Sergeant
Robert E. Buholski; (2) Sergeant Jon C. Gillette; (3)
Lieutenant Wesley C. Shear; (4) Corrections Officer
("CO") David B. Thompson; and (5) Lieutenant William
Lillie. [3]

[3]    Defendant Lillie has not been served in this case.
       After the first attempt at service was unsuccessful
       for various defendants, the court reissued summonses
       on March 31, 2011. (Dkt. No. 34). Service on
       four of the five new defendants was successful, and
       they all join in the motion for summary judgment.
       Another summons for defendant Lillie was reissued
       on October 14, 2011, but the summons was returned
       "unexecuted" on October 26, 2011. (Dkt.Nos.40, 42).

The "Process Receipt" states that defendant Lillie is no longer employed at BCCF. Defendant Lillie has not been served in this action, and defense counsel requests dismissal of the case against defendant Lillie for lack of service under Fed.R.Civ.P. 4(m). (Dkt. No. 47–28; Def. s' Br. at 11) (page assigned by defense counsel to his brief, not the CM/ECF page). Because this court is recommending dismissal with prejudice, both procedurally and on the merits of this action, the court need not address lack of service, which would normally result in a dismissal without prejudice.

Plaintiff claims that on January 12, 2007, when plaintiff was transferred from Herkimer County Correctional Facility ("HCCF"), defendant Harder "ordered his staff to wrongfully imprison and put restraints upon plaintiff by housing him illegally in segragated [sic] housing without any record of a disciplinary incident report or any record of a disciplinary hearing." (Am. Compl. ¶ 6; Facts). Plaintiff also alleges that, beginning on January 17, 2007, "restraints were put on him," and that defendant Harder and his staff violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment with their "deliberate indifference." (Am. Compl. ¶ 6; CM/ECF pp. 6–7). Plaintiff states that he became paranoid "from the loss of liberty enjoyed by other prisoners." (*Id.* at p. 7) Plaintiff alleges that each of the five new defendants "signed an order" wrongfully housing plaintiff in SHU; defendant Thompson signed two orders; and defendant Shear also signed an order "to place Plaintiff in restraints whenever he left his cell." (Am. Compl. ¶ 7; Causes of Action; CM/ECF pp. 6–7).

There is no dispute in this case that plaintiff was housed in "segregated housing" for the entire time that he was incarcerated in BCCF. Defendants state that plaintiff was in Administrative Segregation ("Ad Seg"), rather than *disciplinary* segregation. In support of the motion for summary judgment, each defendant has submitted an affidavit, explaining the circumstances under which plaintiff was confined to Ad Seg for the period between January 12th and February 13't' of 2007. (Dkt.Nos.47–19–47–26). An affidavit was submitted by Sergeant Edward J. Cermak, who is not a defendant, but states that it was he, (not defendant Gillette),[4] who reviewed the Order placing plaintiff in Ad Seg in the facility's SHU (D–Pod). (Dkt. No. 47–20; Cermak Aff. ¶ 12; Gillette Aff. ¶ 11). Affidavits were also submitted by CO Franklin Sherman, the Classification Officer at BCCF; and Mark Smolinsky, the Jail Administrator at BCCF. (Dkt.Nos.47–24, 47–25).

4      Based on this admission by Sergeant Cermak, plaintiff has requested in his response to the motion for summary judgment, that the court allow plaintiff to amend his amended complaint to remove defendant Gillette as a defendant and replace him with Sergeant Cermak. Generally, the court would allow such an amendment. However, because the court is recommending dismissal on the merits of this case, it would be futile to add Sergeant Cermak at this time. The court would still recommend dismissal notwithstanding the addition of Sergeant Cermak. The court will consider his affidavit.

**\*2** Defendants' affidavits all state that plaintiff was transferred from HCCF to BCCF on January 12, 2007. Prior to the transfer, defendants state that, on January 11, 2007, a " 'Custodial Transfer Information' sheet" was created at HCCF, evidencing plaintiff's transfer. (Buholski Aff. ¶ 2; Cermak Aff. ¶ 2; Gillette Aff. ¶ 2; Shear Aff. ¶ 2; Sherman Aff. ¶ 3; Smolinsky Aff. ¶ 5; Thompson Aff. ¶ 3).[5] This information, prepared by Lieutenant John Coddington at HCCF, indicated that plaintiff had known mental health problems, was on medication, had been assaultive toward staff and inmates at HCCF, and had poor adjustment to confinement. (*Id.* & Ex. F)

5      Many of the affidavits contain similar paragraphs regarding the background of this case. The court will cite to the affidavit of Mark Smolinsky, Jail Administrator, for ease of citation, even though the same information is contained in other affidavits. Mr. Smolinsky is *not* a defendant in this case, and his affidavit contains additional information that is relevant to the motion. I will cite to other affidavits as noted for additional information that is not contained in Administrator Smolinsky's statement.

Accompanying the custodial transfer information, was a letter from HCCF Lieutenant Coddington, further explaining that plaintiff had an "extensive psychiatric history"; had been assaultive toward staff at HCCF; had very long fingernails, which he refused to cut and had threatened to use as weapons against the staff; had a long history of threat-related activity, including threats to the President of the United States;[6] had been housed in HCCF Ad Seg due to continued outbursts and threats toward staff; had not been housed in general population due to unstable behavior and continued to be housed "alone"; was very paranoid, and was subject to "drastic mood swings." (Smolinsky Aff. ¶ 6 & Ex. G). The court

Harvey v. Harder, Not Reported in F.Supp.2d (2012)

2012 WL 4093792

notes that while incarcerated in HCCF, on October 8, 2006, plaintiff was notified that his "classification level" was "Maximum." [7] (Def.s' Ex. D).

[6]     Defendants have also filed the June 6, 2006 letter of Timothy M. Kirk, Resident Agent in Charge of the Syracuse office of the United States Secret Service. (Def.s' Ex. B). The letter requests that the Secret Service be notified in the event the plaintiff was released from custody for any reason, due to plaintiff's long history of threat-related activity. (*Id.*) The reason for this request was so that, if plaintiff were released, the Secret Service could assess whether he posed a danger to "any of our protectees." (*Id.*)

[7]     Plaintiff was incarcerated in HCCF, pending his prosecution for First Degree Rape; Third Degree Assault; Second Degree Unlawful Imprisonment; and Criminal Mischief. (*See* Def. s' Ex. E; Herkimer County Court commitment, dated October 30, 2006 —indicating no bail pending trial). Plaintiff was clearly incarcerated in HFFC prior to October 30th because his classification notice is dated October 8, 2006. (Def. s' Ex. D).

Plaintiff arrived at BCCF on Friday, January 12, 2007 at approximately 12:49 p.m. (*Id.* ¶ 7). He was screened by CO Joe Spaziano, who noted that the plaintiff had a "chronic psychiatric history with mental health treatment" and referred him to the forensic unit for evaluation. (*Id.*) Plaintiff was taken to the Ad Seg area of the forensic/medical unit at 5:29 p.m. on January 12. Until that time, plaintiff had been housed in cell number 5 of the "admissions unit," where all inmates are housed as part of the facility's admission procedures. [8] (*Id.* & Def.s' Ex.H; Housing History Sheet). The forensic referral sheet is Defendants' Exhibit I. On January 14, 2007, plaintiff was cleared by forensics, medical, and corrections to leave the medical unit, and he was then taken to A–Pod, another housing unit used for classification purposes. (*Id.* ¶ 15 & Def.s' Ex. H). CO Sherman is the facility's Classification Officer, and was charged with completing plaintiff's classification. (Sherman Aff. ¶ 2).

[8]     An Ad Seg Order was drafted on January 12, 2007 by defendant Thompson. (Def. s' Ex. J). There were three reasons marked with an "X" for why plaintiff was being placed in Ad Seg. The first reason was due to "facility admission procedures." The second and third reasons were that the staff perceived a serious threat to the inmate's safety (although no request

for protection had been made) and the inmate was exhibiting unusual behavior and could threaten to, or cause injury to himself or others. (*Id.* & Buholski Aff. ¶ 8). Defendant Buholski reviewed the order and placed plaintiff in Ad Seg within the medical unit. (Buholski Aff. ¶ 10). The order was approved by defendant Lillie. (*Id.* & Def. s' Ex. J).

Prior to the completion of plaintiff's classification, on January 17, 2007, there was an incident in A–Pod, in which plaintiff allegedly directed threats toward the President of the United States as well as other individuals. (Smolinsky Aff. ¶ 16; Sherman Aff. ¶ 8). Because of this incident, plaintiff was returned to the medical unit at 2:00 p.m. on January 17th. (*Id.* & Def.s' Ex. H). Another Ad Seg order was drafted by CO Thompson, who noted that plaintiff was being admitted to Ad Seg as part of the facility admission procedure, but also noted that the staff perceived a serious threat to the inmate's safety, although he had not requested protection. (Shear Aff. ¶ 10 & Def.s' Ex. M). Sergeant Cermak reviewed the Order and directed plaintiff's placement in Ad Seg in SHU. (Shear Aff. ¶ 12). At the same time, defendant Shear states that he signed a "Restraint Order" which meant that plaintiff would have a "two officer escort" anytime that he was out of his cell. (Shear Aff. ¶ 13). Defendant Shear states that "[n]o physical restraints, e.g. handcuffs, shackles, etc., were made part of this Order, or placed on the plaintiff." (*Id.*). When plaintiff was released from the medical unit on January 18, 2007 he, was placed in Ad Seg in D–Pod, the SHU of BCCF to finish out his classification period. [9] (*Id.*) Defendant Shear states that he had no control over plaintiff's ultimate classification. (Shear Aff. ¶ 16).

[9]     Defendant Shear states that inmates may be placed in D–Pod without a hearing for reasons other than disciplinary. (Shear Aff. ¶ 15).

**\*3** Plaintiff's classification was completed on Friday, January 19, 2007. He was determined to be a "maximum" security inmate, and his assignment to D–Pod was continued. (*Id.* ¶ 18). CO Sherman states that he conducted the classification pursuant to the facility's "Classification of Inmates" and the "Special Security Classification" policy. (Sherman Aff. ¶ 9). The "Special Security Classification" policy allows the facility to assign inmates to SHU if they have exhibited violent behavior during periods of incarceration. (Sherman Aff. ¶ 10). CO Sherman states that in making his classification determination, he considered the transfer papers sent by HCCF. In addition, he noted that plaintiff's current

2012 WL 4093792

charges included Rape in the first and second degree, both violent felonies; he had exhibited assaultive behavior at HCCF; had an extensive psychiatric history; had a history of substance abuse; and had threatened the President of the United States. (Sherman Aff. ¶ 10). CO Sherman used a "Classification Point Scale" and determined that plaintiff was a "maximum" security inmate, not eligible for general population. (*Id.* ¶ 11). CO Sherman states that this classification was not made for punitive reasons, but for the safety and the security of the facility, its staff, and other inmates. (*Id.*) Plaintiff was notified of his classification on Monday, January 22, 2007. (Smolinsky Aff. ¶ 19).

Plaintiff was transferred out of BCCF on February 13, 2007. (Def .s' Ex. H). Defendants do not dispute that plaintiff was confined in "segregated housing" for his entire stay at BCCF.

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); Fed.R.Civ.P. 56(c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). However, when the moving party has

met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

**\*4** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

In order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process. *Sweet v. Wende Correctional Facility,* 514

F.Supp.2d 411, 413 (W.D.N.Y.2007) (citing *Rosales v. Bennett,* 297 F.Supp.2d 637, 639 (W.D.N.Y.2004) (discussing the difference between the grievance process and the administrative appeals process for disciplinary or administrative segregation appeals).

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**B. Application**

Plaintiff in this case did not challenge his classification or the administrative segregation decision. In his response to the summary judgment motion, plaintiff argues that he asked a corrections officer about challenging the decision. (Pl.'s Br. at 14). The corrections officer told plaintiff that BCCF did not have a grievance committee, "you write a sergeant if that doesn't work you write a lieutenant." (*Id.*) Plaintiff claims he wrote to both a sergeant and a lieutenant, who told plaintiff that he "is on administrative segregation and there is nothing anyone can do about it." (*Id.*) In support of his argument, plaintiff cites Jail Administrator Smolinsky's affidavit, which confirms that an administrative segregation decision is not "grievable." (*Id.* & Smolinsky Aff. ¶ 21).

 **\*5** Plaintiff may be attempting to claim that the officers prevented him from challenging the decision by "misleading" him about the proper procedural vehicle for the challenge. The corrections officer who told plaintiff that the decision was not grievable was not misleading. While defendants agree that an administrative segregation decision is not subject to the "grievance" process, the defendants assert that the Ad Seg decision is subject to challenge by appealing to the Facility Administrator. (Def.s' Ex. P). Defendants' Exhibit P is a page from the Inmate Handbook, specifically referencing "Administrative Segregation/Protective Custody." The handbook states that "[y]ou have the option to appeal administrative segregation decisions to the Facility Administrator." (*Id.*)

Plaintiff in this case concedes that he did not appeal to the Facility Administrator when he states that he wrote to a sergeant and a lieutenant. There is no indication, and he does not allege, that he was not given an inmate handbook. The "corrections officer" was correct in telling plaintiff that an administrative segregation determination was not grievable because the proper method of appeal is through the Jail Administrator.

The court understands that plaintiff's incarceration at BCCF was quite short, and one of the exceptions noted above involves whether the administrative remedies were actually "available" to the plaintiff. The administrative segregation decision was ultimately made on January 19, 2007, and plaintiff was transferred to another facility on February 13, 2007. It is unclear how long it would have been taken to challenge the classification. There may have been very little time to appeal the decision. It has been held that transfer to other custody does not eliminate the plaintiff's duty to exhaust his administrative remedies, "at least where an inmate has sufficient time to pursue administrative remedies in the facility where the incident complained of took place." *Flowers v. City of New York,* 668 F.Supp.2d 574, 578 (S.D.N.Y.2009). If there were insufficient time to appeal, an exception to the exhaustion requirement might be available to plaintiff. While, the court could recommend dismissal for failure to exhaust, because the case may also be dismissed on the merits, and there could be an argument that plaintiff did not have sufficient time to appeal the decision, I will not recommend dismissing the action based solely upon plaintiff's failure to exhaust administrative remedies.

**IV. *Due Process***

**A. Legal Standards**

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ...,

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

**\*6** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.,* 30 days–there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases). *See also Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998) (the *Sandin* analysis is properly applied to determine whether non-punitive, administrative segregation implicates a state-created liberty interest).

### B. Application

Plaintiff was in Ad Seg at BCCF from January 12, 2007 until February 13, 2007, a total of 32 days. The first eleven days,[10] however, were spent in Ad Seg due to the admissions/classification procedure at the facility. New York regulations governing county jails provide that the chief administrative officer of each facility shall "establish, implement and maintain a formal and objective system for the consistent classification of all inmates." N.Y.

COMP. CODES R. & REGS. tit. 9, § 7013.1 (N.Y.CRR)). The regulations are quite detailed and provide specific requirements for such policies and procedures. *Id.* 9 NYCRR § § 7013.1–7013.9.

[10]   January 12, 2007 until January 22, 2007 (counting the first day that he was brought to BCCF as "one" and the day the he was notified of his classification).

In accordance with these regulations, BCCF policy provides that, upon transfer into the facility, all inmates must go through initial screening and classification procedures. (Def.s' Ex. N; Broome County Sheriff's Correction Division Policy Statement). The policy statement provides that "[u]pon completion of the initial screening and risk assessment the inmate will be placed in Ad Seg for classification." (*Id.* ¶ 3). Classification may last up to five business days.[11] (*Id.*) If records are not available, the Jail Administrator may extend the classification time to ten business days.

[11]   Although it appears that the defendants complied with state regulations, providing for particular time limits, the violation of a state law or regulation alone would not necessarily rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744–45 (S.D.N.Y.2002). *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

**\*7** The policy statement also provides detailed factors that the classification officer must consider when determining how to classify an inmate for housing purposes. (*Id.* ¶ 6(a)–6(j)). Those factors include criminal history; propensity for victimization or violence; history of medical or mental illness; history of hostile relationships with other inmates; and any other information that "may affect the safety and welfare of the inmate or facility staff." (*Id.*) After the primary classification interview is completed, the interviewing officer recommends appropriate housing for the inmate. (*Id.* ¶ 10). This paragraph also provides a procedure for challenges to primary housing assignments, and any changes in primary housing relating to custody level will be discussed with the inmate by the classification officer and tour supervisor. (*Id.* ¶ 10(b), 10(c)). The classification officer competes a "Classification Sheet," containing a numerical value assigned to the various factors considered. (Def.s' Ex. O).

"The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and

2012 WL 4093792

administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84 (1987)). The overarching consideration is that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Id.* Finally, the court determines whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

In this case, the regulations cited above, together with the policy of allowing temporary segregation of inmates upon transfer into a facility are unquestionably related to the safety and security of the facility. Until an inmate is screened for prior violence; propensity for victimization; possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be. Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty. The regulations provide for notice to the inmate and for a challenge to the classification. Thus, the regulations are valid under *Turner,* and no due process right is violated. [12]

[12]    The court would also point out that the regulations do not violate equal protection because all inmates are subject to the same regulations governing classification. Plaintiff does not mention equal protection in his amended complaint, however, in his response the motion for summary judgment, he mentions equal protection for the first time. Even assuming that plaintiff could raise a new claim in his response, this claim has no merit. In order to state a claim for an equal protection violation, plaintiff would have to allege that other similarly situated inmates were treated differently that he was. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (the Equal Protection Clause provides that the government shall treat all similarly-situated people alike). Plaintiff in this case has not alleged that

any other inmates, similarly situated to plaintiff, were treated differently regarding classification.

As shown by the plaintiff's housing history report, he spent part of his classification time in the mental health area of the medical unit. (Def.'s Ex. H). Although he complains that the administrative segregation damaged his mental health and that defendants were deliberately indifferent to his mental condition, it appears that the defendants were very concerned about his mental condition, and according to his housing record, placed him in the medical unit three times prior to his final classification. [13] Defendants could not ignore the transfer papers indicating that plaintiff was a safety risk. [14] They could not ignore plaintiff's unusual behavior and statements to the screening officer, and the progress notes written during his stay in the medical unit show that the concern for his mental health was justified. [15] (Def.s' Ex. L).

[13]    Plaintiff's own exhibits show that on January 19, 2007, plaintiff was brought back to the medical unit for a physical problem, unrelated to his mental status. (Pl.'s Ex. F). The exhibit also shows that the progress note for January 18, 2007 states that the inmate was "seen and cleared by forensics today. [L]eft unit for general population." *Id.* Plaintiff argues that Dr. Rahmon "increased his medication and cleared him for general population on January 14th. (Pl.'s Br. at 7). Plaintiff cites his Exhibit B as support for this, however, Exhibit B only states that Dr. Rahmon increased plaintiff's medication. Exhibit D is the exhibit to which plaintiff may be referring, however, the note only states that plaintiff left the unit for general population on January 18th, not that plaintiff was "cleared" for general population. In any event, plaintiff was still in his classification period on January 14th and could not have gone back to general population because his classification was not completed until January 19.th

[14]    As part of plaintiff's "equal protection" claim, he argues that the defendants cannot "prove" that they ordered other inmates into Ad Seg, based upon letters from another county. The burden is on plaintiff to show that he was treated differently than other "similarly situated" inmates. He makes absolutely no claim that other inmates who had such a history of violence and threats were treated differently and makes no claim that other inmates were not placed in Ad Seg as part of the admission/classification procedures.

**15**    On January 14, 2007, the progress notes indicate that Dr. Rahmon was "in to see inmate." (Def.s' Ex. H). The note states that plaintiff's speech was "rushed," his thoughts were racing, he stated that he was a producer from Los Angeles, who spoke to a Fox news reporter about "the CIA issues," and "spoke to himself 'most of the day.'" (*Id.*) On January 17, 2007, plaintiff was involved in an incident whereby plaintiff allegedly threatened the President of the United States, resulting in his second transfer to the mental health unit. Based upon plaintiff's history and behavior, he cannot seriously argue that defendants had no reason to be concerned about the security of the facility.

**\*8**    In addition, plaintiff's relatively brief Ad Seg placement did not implicate a liberty interest under *Sandin.* Plaintiff's classification was completed on Friday January 19, 2007, and he was notified of his classification on Monday January 22, 2007, one business day after the determination was made. [16] He was entitled to a review of this classification, but did not take the opportunity to challenge it. Plaintiff spent the last 21 days of his stay at BCCF in Ad Seg. Based on *Sandin,* a period of 30 days segregation does not create a liberty interest, particularly when plaintiff has not made any assertion that the conditions of confinement (other than the separation from other inmates) was in any way atypical or significant. Even if the court were to count the entire time that plaintiff was in administrative segregation (32 days), he still would not have had a liberty interest that is protected by due process. [17]

**16**    The New York Regulations provide for notice of the classification determination in "one business day" after the determination is made. 9 NYCRR § 7013.8(f).

**17**    *See, e.g., Brown v. Graham,* 9:07–CV–1353 (FJS/ATB), 2010 WL 6428251, at \*9 (N.D.N.Y. Mar. 30, 2010) ("The federal district courts in New York, applying *Sandin,* have been consistent in holding that terms of SITU or "keeplock" of approximately 30 days or less do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.") (Report–Recommendation), adopted, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011); *Rivera v. Goord,* 9:05–CV–1379, 2008 WL 5378372 at \*2–\*3 (N.D.N.Y. Dec. 22, 2008) (granting summary judgment on the issue

that 40 days in room confinement did not constitute a cognizable liberty deprivation under *Sandin* ); *Smith v. Taylor,* 149 F. App'x 12, 2005 WL 2019547 at \*1 (2d Cir.2005) (affirming grant of summary judgment dismissing plaintiff's claims of defects in an administrative hearing that resulted in his disciplinary confinement for 45 days in the SITU; plaintiff did not offer evidence that his confinement was more onerous that those generally present in the SITU and thus did not have a protected liberty interest in avoiding the 45–day confinement).

Finally, even if plaintiff had a liberty interest, he received all the process he was due. It is clear that his confinement was administrative, not disciplinary. Plaintiff confuses the two types of confinement. He continues to argue that he was entitled to notice of "charges." There were no "charges" of which to receive notice. Instead, he got notice of the *classification determination* and an opportunity to challenge the determination as required by the regulations involving classification and housing assignments. The fact that he did not challenge the determination does not change the result. Thus, for all of the above procedural and substantive reasons, plaintiff's due process claim may be dismissed.

## V. *Conditions of Confinement*

Plaintiff hints that certain of his conditions of confinement were unconstitutional. Plaintiff states that defendants were deliberately indifferent to his mental health by keeping him in "isolation." Plaintiff also states that defendants issued a "restraint order," and he was placed in restraints whenever he left the cell.

### A. Medical Care

#### 1. Legal Standards

The defendants never actually mention the date of plaintiff's conviction. The reason the court mentions this is simply to clarify the standard under which conditions of confinement are analyzed. Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment. *See Caiozzo v. Korman,* 581 F.3d 63, 69 (2d Cir.2009). It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979) (contrasting sentenced

prisoners with pretrial detainees). Sentenced prisoners are protected by the Eighth Amendment prohibition against cruel and unusual punishment. However, the same standard applies to claims of deliberate indifference to a serious threat to the health or safety of a person in custody, regardless of whether they are brought under the Eighth Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for pretrial detainees.[18] *See Caiozzo v. Korman,* 581 F.3d at 72. Thus, the date of plaintiff's conviction is not relevant to any discussion because the standard would be the same whether plaintiff were still a pretrial detainee or whether he had been convicted of the charges.

[18]    Because the due process rights of pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner," and the same standard applies, cases cited that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims of a pretrial detainee. *Revere v. Mass Gen. Hosp.,* 463 U.S. 239, 244 (1983).

**\*9** In order to state a claim based on constitutionally inadequate medical treatment, plaintiffs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

### 2. Application

Plaintiff in this case claims that the isolation made him depressed and harmed his mental health. However, plaintiff spent several days in the mental health unit, and was examined by Dr. Rahmon, according to the progress notes submitted by both plaintiff and defendants. (Def.'s Ex. L). Plaintiff was monitored and his medications were regulated. There is absolutely no indication that the defendants, none of whom are medical personnel, were deliberately indifferent to plaintiff's medical needs, because it is clear that, when a concern arose regarding plaintiff's mental health, he was transferred to the medical

unit for observation. Plaintiff's conclusory allegation that the "isolation" made his mental status worse is baseless.

### B. Restraints

#### 1. Legal Standards

In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). The placement of restraints such as handcuffs on an inmate does not, by itself, amount to excessive force or cruel and unusual punishment. *See Bridgeforth v. County of Rensselaer,* No. 1:08–CV–779, 2012 WL 2873361, at \*6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law).

In this case, defendant Shear states that he did sign a "Restraint Order," but the order only called for plaintiff to have a two-officer escort or "double team" anytime that he left his cell. (Shear Aff. ¶ 13). Defendant Shear further states that "[n]o physical restraints" such as handcuffs or shackles were made a part of the order, "or placed on plaintiff." (*Id.*) Plaintiff himself submits the Order in question, and it supports defendant Shear's affirmation. (Pl.'s Ex. C; Dkt. No. 50–1 at 6). The order is signed by defendant Shear. Although the typewritten portion of the order states that, due to plaintiff's involvement in the January 17t' incident, he would be placed in "full restraints" when he left the housing unit for a period of seven days, above the typewritten material, is a handwritten note by defendant Shear that reads: "Double Team only." (*Id.*) The order was reviewed and continued on two occasions: "1/26/07 ... 2/2/07." (*Id.*)

**\*10** Plaintiff's own exhibits support defendant Shear's statement that no physical restraints were placed on plaintiff. (Pl.'s Ex. C, G). The "restraint" only involved assigning two officers to plaintiff when he left the housing unit. This order does not come anywhere near the level of a constitutional violation, particularly given plaintiff's behavior during the time in question. Thus, to the extent that plaintiff's amended complaint can be read as alleging an Eighth Amendment or Substantive Due

**Harvey v. Harder, Not Reported in F.Supp.2d (2012)**

2012 WL 4093792

Process claim regarding his conditions of confinement, it may be dismissed. [19]

[19]    Defendant Harder also argues that he had no contact with plaintiff and bore no personal responsibility for his housing assignment or any other problem that plaintiff might have had at BCCF. (Harder Aff. ¶ 2). Because the court is recommending dismissal on the merits and on procedural grounds, defendant Harder's involvement is not critical to the court's recommendation. The court would just note that personal involvement is required for the assessment of damages in a section 1983 action. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). The same is true for defendant Jon Gillette who was mistakenly named by plaintiff instead of Edward J. Cermak.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED,** and

plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is further

**ORDERED,** that plaintiff's request to amend the amended complaint to remove defendant Gillette and add defendant Cermak (Dkt. No. 50) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4093792

---

**End of Document**            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Harvey v. Harder, Not Reported in F.Supp.2d (2012)

2012 WL 4093760

2012 WL 4093760
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gregory HARVEY, Plaintiff,

v.

David HARDER, et al., Defendants.

No. 9:09–CV–154.

|

Sept. 17, 2012.

**Attorneys and Law Firms**

Gregory Harvey, Ossining, NY, pro se.

Aaron J. Marcus, Binghamton, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation dated July 31, 2012 recommended that: (1) Defendants' motion for summary judgment be granted, and Plaintiff's amended complaint be dismissed on its merits in its entirety against all Defendants; and (2) Plaintiff's request to amend his amended complaint to remove defendant Jon Gillette and add defendant Edward Cermak be denied as moot.

Plaintiff filed timely objections to the ReportRecommendation, essentially raising the same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Baxter for the reasons stated in the Report–Recommendation.

It is therefore

**ORDERED** that Defendants' motion for summary judgment be **GRANTED,** and Plaintiff's Amended Complaint be **DISMISSED;** and it is further

**ORDERED** that Plaintiff's request to amend his amended complaint to remove defendant Jon Gillette and add defendant Edward Cermak is DENIED as moot.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4093760

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terrell K. ELEBY, Plaintiff,

v.

G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS:ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

**REPORT AND RECOMMENDATION**

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND [1]

[1]    In light of the procedural posture of the case, the
following recitation is derived from the record now
before the court, with all inferences drawn and
ambiguities resolved in plaintiff's favor. *Terry v.
Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.*, Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and

telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at 73-72.

## II. PROCEDURAL HISTORY

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action.[2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

[2]    Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

A. Legal Standard Governing Summary Judgment
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies
**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —— Fed.Appx. ——, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts

a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

[4]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(3)(i), (ii).

[5]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

*4 The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the

superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

[6]     According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

## 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

[7]     Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

[8]     In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly

filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

*6 Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

[9]   In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[10]   If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Slip Copy, 2017 WL 986123

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,
v.
City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City
Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently
incarcerated and proceeding *pro se*, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983") against
Correction Officer Benjamin Eason ("Defendant"),
alleging violations of the Eighth Amendment. Now before
the Court is Defendant's motion for summary judgment.
For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

[1]    The following facts are drawn from Defendant's
       unopposed Local Civil Rule 56.1 Statement. (Doc.
       No. 55 ("56.1 Statement" or "56.1 Stmt.").) In
       deciding Defendant's motion for summary judgment,
       the Court has also considered Plaintiff's submission
       in opposition to summary judgment (Doc. No. 58
       ("Opp'n")), and has conducted an independent review
       of the record, notwithstanding Plaintiff's failure to
       submit a statement compliant with Local Civil Rule
       56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73
       (2d. Cir. 2001) (noting that district court "may in its

discretion opt to conduct an assiduous review of the
record even when" a party has failed to comply with
Local Civil Rule 56.1 (citations and quotation marks
omitted)).

On September 9, 2012, while incarcerated at the Otis
Bantum Correctional Center ("OBCC") on Rikers Island,
Plaintiff was placed in an intake cell in the OBCC's
receiving area, which he shared with two other individuals.
(56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell
was extremely cold, vermin-infested, and too small to
accommodate three men. (*See* Doc. No. 54-1 ("Compl.")
4, 8.) Plaintiff further alleges that these conditions,
coupled with the constant noise made by the two other
inmates, prevented him from sleeping for the entire 60-
hour period that he was held in the cell. (*See id.* at 4.)
Consequently, he asked Defendant, who was on duty,
to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.)
According to Plaintiff, Defendant responded that there
was "nothing he could do" about the situation. (*Id.* ¶ 9; *see
also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC
to complain about his experience in the cell. (*See* Compl.
at 7.) The New York City Department of Correction
("DOC") has an administrative grievance procedure,
known as the Inmate Grievance and Request Program
("IGRP"), for inmates housed at facilities such as the
OBCC. The IGRP, which was available and in effect at all
times relevant to this lawsuit, requires that inmates first
file a complaint with the Inmate Grievance Resolution
Committee ("IGRC") within ten days of the complained-
of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP
Directive") § IV(D)(1).) The IGRC then attempts to
resolve the grievance informally within five days, and if the
grievance is not informally resolved, then the inmate may
request a formal hearing before the IGRC. (56.1 Stmt. ¶
12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may
appeal the IGRC's decision to the commanding officer, or
her designee, and subsequent appeals may be taken to the
Central Office Review Committee ("CORC"). (56.1 Stmt.
¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's
decision is the final and binding decision of the DOC; if
an inmate disputes the decision of the CORC, he may
independently appeal to the Board of Correction. (IGRP
Directive at 47.) Finally, if an inmate does not receive a
timely disposition at any point throughout the grievance
process, he has the option of either granting an extension
of time to the relevant decisionmaker (i.e., the IGRC,
the commanding officer, or the CORC) or appealing and

Case 9:17-cv-00425-DNH-TWD    Document 26    Filed 12/04/17    Page 62 of 106
Mena v. City of New York, Not Reported in F.Supp.3d (2016)
2016 WL 3948100

proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled

to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of

the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question,"

2016 WL 3948100

but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier

'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that

the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]  Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3948100

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2159199

2010 WL 2159199
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,
v.
Edith ONUA, Edwin Oduro, and
June Yazzo Liason, Defendants.

No. 09 Civ. 7227(SAS).
|
May 26, 2010.

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

Robert F. Meehan, Westchester County Attorney, Fay
Angela Jones, Senior Assistant Westchester County
Attorney, White Plains, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

*\*1* Donald Mack Bennett, presently incarcerated and
proceeding pro se, brings this action against Edith Onua,
Edwin Oduro, and June Yazzo Liason[1] pursuant to
section 1983 of Title 42 of the United States Code. Bennett
seeks monetary damages in the amount of $5,000,000
for alleged emotional distress, negligence, deliberate
indifference, and medical malpractice. Defendants now
move to dismiss pursuant to Federal Rule of Civil
Procedure 12(c) for failure to exhaust administrative
remedies under 42 U.S.C. § 1197e(a) and failure to state
a claim under 42 U.S.C. § 1983. For the reasons stated
below, the motion to dismiss is granted.

1        Hereinafter, "Defendants."

**II. BACKGROUND**[2]

2        The facts recited here are drawn from the Complaint
         ("Compl."), attached as Ex. A to the Declaration
         of Fay Angela Jones ("Fay Decl."), Senior Assistant
         County Attorney.

Bennett was incarcerated at the Westchester County Jail
("WCJ") from February 20, 2009, through February 27,
2009.[3] On February 20, 2009, Bennett was examined by
Edwin Odoro, a physician's assistant ("P.A.").[4] At the
time of the examination, Bennett had in his possession
a hospital discharge paper with all his prescribed
medications.[5] During the week of February 20, 2009 until
Bennett's court date (on February 27, 2009), he allegedly
submitted five "sick-call slips" but was not contacted until
Edith Onua, also a P.A., called to tell him she could not
prescribe his "life sustaining medication."[6]

3        See Compl. Section II–D.

4        See id.

5        See id.

6        Id.

On February 27, 2009, Bennett was taken to court without
being given his medication.[7] Bennett subsequently
became ill and was taken to Sound Shore Medical Center,
where he was treated and released.[8] Bennett claims
defendant June Yazzo Liason, also a P.A., purposely
informed the WCJ staff that nothing was wrong with
him because she is racially biased against him.[9] Bennett
further claims that Yazzo denies any grievance he files on
the same racially-motivated grounds.[10]

7        See id.

8        See id. Bennett alleges he had a "massive heart attack,
         grand mal seizure, and almost had a stroke" and
         that he "ran blood pressure 196 over 145, heart
         rate running over 230 beats." Id. Defendants include
         WCJ documentation of Bennett's lengthy medical
         problems. See Ex. C to Fay Decl.

9        See Compl. Section II–D.

10       See id.

**III. APPLICABLE LAW**

   **A. Rule 12(c)**

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial. [11] Judgment on the pleadings should be granted if it is clear that the moving party is entitled to judgment as a matter of law. [12] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim. [13] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint" [14] and "draw all reasonable inferences in the plaintiff's favor." [15] Even so, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." [16] In deciding a motion for judgment on the pleadings, a court may consider

[11]   See Fed.R.Civ.P. 12(c).

[12]   See Burns Int'l Sec. Servs. v. International Union, 47 F.3d 14, 16 (2d Cir.1995).

[13]   See Patel v. Contemporary Classics, 259 F.3d 123, 126 (2d Cir.2001).

[14]   Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007). Accord Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir.2009).

[15]   Ofori–Tenkorang v. American Int'l Group, Inc., 460 F.3d 296, 298 (2d Cir.2006).

[16]   In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings. [17]

[17]   Prentice v. Apfel, 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)).

## B. Prison Litigation Reform Act

**\*2** The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [18] The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [19] "[A]s long as other forms of relief are obtainable through administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings." [20]

[18]   See 42 U.S.C. § 1997e(a) (providing that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."). See also Porter v. Nussle, 534 U.S. 516, 516 (2002).

[19]   Porter, 534 U.S. at 532.

[20]   Booth v. Churner, 532 U.S. 731, 741 (2001) (requiring an inmate to complete the prison administrative process before suing over prison conditions even where the inmate sought only money damages, which could not be recovered through the administrative process).

Failure to exhaust is an absolute bar to an inmate's action in federal court as "[section] 1997e(a) requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." [21] Failure to exhaust is an affirmative defense, however. [22] As such, plaintiff need not plead exhaustion in the complaint. [23]

[21]   Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001), rev'd. on other grounds (quotation marks and citation omitted) (emphasis in original).

[22]   See Jenkins v. Haubert, 179 F.3d 19, 28–29 (2d Cir.1999).

[23]   See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available [24] to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [25]

[24]   To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738. In some circumstances, the behavior of the defendant may render administrative remedies unavailable. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (remanding case to the district court to determine whether some seemingly available remedies were rendered unavailable by threats made by correction officers).

[25]   *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

When any of the above are present, the affirmative defense of non-exhaustion fails. [26] Where (1) administrative remedies were available to the plaintiff, (2) defendants are not estopped and have not forfeited their non-exhaustion defense, and yet (3) plaintiff did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged to justify "the prisoner's failure to comply with administrative procedural requirements." [27]

[26]   *See Hemphill,* 380 F.3d at 686.

[27]   *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute proper exhaustion." [28] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [29]

[28]   *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005)) (noting that Braham cannot survive *Woodford v. Ngo,* 548 U.S. 81, 94–95 (2006), which states that plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to [prison] staff.").

[29]   *Id.* (quoting *Woodford,* 548 U.S. at 95).

### C. Westchester County Department of Corrections Inmate Grievance Program

The Westchester County Department of Corrections ("WCDOC"), Jail Division, has an established Inmate Grievance Program ("IGP") approved by the New York State Commission on Correction ("NYSCOC") . [30] A "grievance" is defined as "any inmate/detainee complaint relating to any facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility ." [31] In 2009, the IGP allowed inmates to make informal complaints to the Block Officer, who would log such complaint and attempt to resolve them. [32] Grievances that could not be resolved in this manner entered a formal process affording two levels of subsequent appeal. [33]

[30]   *See* Affidavit of Anthony Amicucci ("Amicucci Aff."), Warden of the Westchester County Department of Correction, ¶ 5; *see also* Ex. 1 to Amicucci Aff. (copy of the WCDOC grievance procedures).

[31]   Amicucci Aff. ¶ 8.

[32]   *See id.* ¶ 9.

[33]   *See id.* ¶¶ 11–13. *See also* Westchester County Department of Correction Policy and Procedure, Ex. 1 to Amicucci Aff. at 4 (attached as Ex. E to Fay Deck) (chart showing time schedule for grievance filing and appeal).

### IV. DISCUSSION

#### A. Defendants Have Adequately Demonstrated Bennett's Failure to Exhaust Administrative Remedies

**\*3** Despite Bennett's claim that he filed a grievance at WCJ that was denied, [34] a search of the grievance

log records maintained by WCDOC between February 20 and February 27, 2009 did not reveal any record of a grievance by Bennett concerning his medical care. [35] Bennett claims he informed Warden Amicucci of his grievance. [36] Warden Amicucci states in his sworn affidavit that Bennett never contacted him about any claims. [37] Regardless, notice to a prison official is insufficient. [38] As such, Defendants have adequately supported the affirmative defense of failure to exhaust.

[34]    *See* Compl. Section IV–F.

[35]    *See* Amicucci Aff. ¶ 17. Although Bennett completed Complaint Section IV–F, which asks the inmate to describe the grievance claim if one had been made, he also completed Section IV–G, which states, "If you did *not* file a grievance, did you inform any officials of your claim(s)?" Also, in describing "all efforts to appeal [the instant claim] to the highest level of the grievance process," Bennett simply writes that he has "always appeal [sic] and never sign agreeing." Compl. Section IV–F(3). Bennett cannot have appealed if he never filed an initial grievance.

[36]    *See* Compl. Section IV–G

[37]    *See* Amicucci Aff. ¶ 18.

[38]    *See Macias,* 495 F.3d at 44.

### B. Bennett Has Not Sufficiently Alleged Facts Supporting an Exemption From the Exhaustion Requirement

In light of Defendants' affirmative defense of non-exhaustion, the instant motion now presents three issues: (1) whether administrative remedies were available to Bennett, (2) whether Defendants are estopped from asserting exhaustion as a defense, and (3) whether special circumstances excuse Bennett's failure to exhaust administrative remedies. Bennett has not alleged any facts to support an exemption from the exhaustion requirement.

*First,* Bennett does not allege that all available administrative remedies were procedurally unavailable at WCJ. When first processed into WCJ, inmates receive a packet called "The Inmate Rules and Regulations." [39] The Inmate Rules and Regulations advise inmates that grievance forms are available from the correction staff and from the Law Library. [40] Bennett does not allege that these forms were not available to him or that they did not "afford the possibility of some relief for the action complained of." [41]

[39]    *See* Amicucci Aff. ¶ 6; *see also* Ex. 2 to Amicucci Aff. (copy of the Inmate Rules and Regulations packet).

[40]    *See* Amicucci Aff. ¶ 6.

[41]    *Booth,* 532 U.S. at 738. Bennett was allegedly familiar with the WCJ grievance process, having filed an unrelated grievance about two years prior to commencing this action. *See* Amicucci Aff ¶ 19; *see also* Ex. 3 to Amicucci Aff. (photocopy of WCJ's log of Bennett's unrelated May 2007 grievance).

*Second,* Bennett does not allege that all available administrative remedies were rendered unavailable by any action of any defendant. *Third,* Bennett does not allege that any defendant ever acted in any way that would estop Defendants from asserting non-exhaustion as a defense, or that any special circumstances exist to justify Bennett's failure to exhaust all possible remedies.

### V. CONCLUSION

Because Defendants have adequately supported the affirmative defense of failure to exhaust and because Bennett has not presented any facts on which this Court could base an exception, his Complaint is dismissed without prejudice. Bennett may file a new action once he has exhausted all remedies, as required by PLRA section 1997e(a). Accordingly, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion [Docket No. 17] and this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2159199

---

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4774731
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Stanley HILBERT, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 12 Civ. 3843(ER).
|
Sept. 5, 2013.

**OPINION AND ORDER**

EDGARDO RAMOS, District Judge.

**\*1** Plaintiff Stanley Hilbert ("Plaintiff"), proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, the Americans With Disabilities Act and the Rehabilitation Act against Brian Fischer, Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Green Haven Correctional Facility ("Green Haven") Superintendent William Lee; and various Green Haven "contractors and employees" (collectively, the "Defendants"). [1] Presently before the Court is Defendants' motion to partially dismiss Plaintiff's Amended Complaint. [2] Doc. 65. Specifically, Defendants seek dismissal of Plaintiff's claim of deliberate medical indifference for failure to exhaust administrative remedies. Defendants Fischer and Lee move in the alternative to dismiss Plaintiff's deliberate indifference claim because Plaintiff has failed to demonstrate that they were personally involved in the alleged Constitutional violation. For the reasons discussed below, Defendants' motion for partial dismissal of the Amended Complaint is GRANTED.

[1]   On June 5, 2012, the Court dismissed DOCCS as a Defendant in this action. Doc. 6.

[2]   Plaintiff filed a Notice of Motion along with his opposition papers for an "Order pursuant to Rule 7(b) of the Federal Rule[s] of Civil Procedure granting a trial concerning the complaint." Doc. 77. As the motion is procedurally improper, the Court assumes that Plaintiff filed the Notice of Motion in further support of his opposition to Defendants' motion to dismiss, and will consider it accordingly.

**I. Factual Background**
The Court accepts the factual allegations in the Amended Complaint as true for purposes of Defendants' motion. *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010).

In September 2011, Plaintiff was incarcerated at Marcy Correctional Facility's ("Marcy") Residential Mental Health Unit ("RMHU"). Amended Complaint ("Am.Compl.") ¶ 42. Plaintiff sought mental health treatment at that facility; however, due to the unavailability of observational cells, he was transferred to Green Haven. [3] *Id.* ¶¶ 42–43. On September 27, 2011, at approximately 10:40 am, while still at Green Haven, Plaintiff complained of chest pains and was escorted to the facility infirmary. *Id.* ¶ 45. After Plaintiff had been examined, Defendants Kowalchuk, Rodriguez and Surprenant escorted him back to his cell. *Id.* ¶ 47. On the way back to the cell, Surprenant told Plaintiff that he was "full of shit," that he was "bullshitting and wasting my time," and that "this ain't Marcy [and] we have another way to treat mental illness and you're going to find out soon enough." *Id.* ¶¶ 48–50. Upon hearing this, Plaintiff requested that Surprenant allow him to see a mental health therapist. *Id.* ¶ 51. Defendant Rodriguez then interjected and said that "we got some therapy for you" and that "your [sic] going to need a physical therapist to teach you how to walk again." *Id.* ¶ 52.

[3]   The exact date on which Plaintiff was transferred to Green Haven is not clear from the face of the Amended Complaint.

Upon returning to his cell, Plaintiff was ordered to face the wall, which he did. *Id.* ¶ 53. Surprenant then instructed Plaintiff, who was still in restraints, to turn around and face him. *Id.* ¶ 54. After Plaintiff complied, Surprenant "got nose to nose" with him and stated, "you played games and wasted my time. I told you we have another way to treat mental illness." *Id.* ¶ 55. At that point, Rodriguez "[s]uddenly" punched Plaintiff in the left eye. *Id.* ¶ 56. Defendants Kowalchuk, Rodriguez and Surprenant then began beating Plaintiff "mercilessly with their hands and feet," and "punched and kicked [him] repeatedly about the body, face and head." *Id.* ¶¶ 57–58. Plaintiff alleges that upon information and belief, Defendant Rodriguez then "stepped on [his] lower back

while Defendants Surprenant, Tillotson, Kowalchuk, Keran [sic], and Brothers held [him] down and removed the restraints." *Id.* ¶ 59. Defendants then left the cell and locked it behind them. *Id.* ¶ 61.

**\*2** Plaintiff alleges that he then informed Defendant Kowalchuk that he was in "excruciating pain and need[ed] medical attention," *id .* ¶ 60; however, Kowalchuk refused Plaintiff's request. *Id.* ¶ 62. Approximately one hour later, Defendant Miller, a nurse, arrived at Plaintiff's cell with a corrections officer to take photographs. *Id.* ¶ 63. At that point, Plaintiff's nose was bleeding profusely, he was bleeding out of his left eye, and he could barely stand up. *Id.* ¶ 64. Plaintiff informed Miller that he was in excruciating pain, but she did not "even [perform] a cursory examination ... [and] told Plaintiff that there was nothing wrong." *Id.* ¶¶ 64–65. Plaintiff alleges that Miller told him to "stop whining" and that crying is what babies do. *Id.* ¶ 66. She then exited the cell with the corrections officer. *Id.* ¶ 67.

Over the next two days, from September 27 to 29, 2011, Plaintiff alleges that he requested medical assistance for his injuries from Defendants Morlas, Patil, Panuto, Zwillinger, O'Conner, Brandow, Hannd, Sposato, Santoro, Edwards, Kutz, Kowalchuk, Lamay, and Gotsch, and that these Defendants all denied his requests. *Id.* ¶¶ 68–81. On the morning of September 29, 2011, a doctor came to Plaintiff's cell and, after examining him, determined that he was seriously injured and in need of immediate medical attention. *Id.* ¶ 82. Plaintiff was then transferred to an outside hospital, Westchester County Medical Center, where he was treated and later released. *Id.* ¶ 83. Plaintiff claims that he suffers from frequent migraines, "extreme debilitating back pain," loss of vision and a broken nose. *Id.* ¶ 84.

## II. Plaintiff has not Exhausted Administrative Remedies with Respect to his Eighth Amendment Deliberate Medical Indifference Claim

Plaintiff claims that Defendants violated his Eighth Amendment rights by using unnecessary and excessive force against him and by acting with "deliberate indifference or reckless disregard toward [his] serious medical needs by failing to take the steps necessary to ensure that [he] received treatment for his injuries." Am. Compl. ¶ 87. Defendants argue that Plaintiff's deliberate medical indifference claim should be dismissed because he failed to exhaust the administrative remedies

available under DOCCS' three-tiered Inmate Grievance Program ("IGP"). Specifically, Defendants argue that Plaintiff's grievance only alleged that he was assaulted by several officers at Green Haven, and did not include any allegations that Defendants were deliberately indifferent to his medical needs.

### a. Prison Litigation Reform Act
The Prison Litigation Reform Act ("PLRA") "requires prisoners to exhaust prison grievance procedures before filing suit." *Jones v. Bock,* 549 U.S. 199, 202 (2007) (citations omitted). The PLRA's exhaustion requirement is "mandatory," *Porter v. Nussle,* 534 U .S. 516, 524 (2002), and " 'applies to all inmate suits about prison life.' " *Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012) (quoting *Porter,* 534 U.S. at 532). The Supreme Court has held that "the PLRA exhaustion requirement requires proper exhaustion." *Id.* (quoting *Woodford v. Ngo,* 548 U.S. 81, 93 (2007)) (internal quotation marks omitted). That is, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Id.* (quoting *Jones,* 549 U.S. at 218).

**\*3** In New York, prisoners must exhaust each level of the three-tiered IGP. *Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D .N.Y.2010). Under the IGP, an inmate must: (i) file a complaint with the grievance clerk; (ii) appeal an adverse decision by the Inmate Grievance Resolution Committee ("IGRC") to the superintendent of the facility; and (iii) appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. The IGP regulations provide that an inmate must submit a complaint on an inmate grievance complaint form, or on plain paper if the form is not readily available. 7 NYCRR § 701.5(a)(1). The regulations further require that "the grievance ... contain a concise, specific description of the problem and the action requested." 7 NYCRR § 701.5(a) (2).

Although failure to exhaust is "an absolute bar to an inmate's action in federal court," *George v. Morrison–Warden,* No. 06 Civ. 3188(SAS), 2007 WL 1686321, at *2 (S.D.N.Y. June 11, 2007), the Second Circuit has recognized three grounds for exceptions to the exhaustion requirement. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). First, a court must ask "whether

administrative remedies were in fact 'available' to the prisoner." *Id.* (citation omitted). Second, a court must determine whether the defendant forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendant's own actions estop him from raising the affirmative defense of non-exhaustion. *Id.* Finally, if the court finds that administrative remedies were available to the plaintiff, and that the defendant is not estopped and has not forfeited his non-exhaustion defense, a court should consider whether any " 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

### b. The Court May Consider Extrinsic Material Because Plaintiff was on Notice that Defendants' Motion to Dismiss Might be Converted to One for Summary Judgment and had the Opportunity to Submit Evidence Relevant to the Issue of Exhaustion

Defendants move to dismiss Plaintiff's deliberate indifference claim pursuant to Fed.R.Civ.P. 12(b)(6). Along with their moving papers, Defendants submit the declaration of Jeffery Hale, as well as a copy of the grievance Plaintiff filed at Marcy, numbered MCY–15928–12. *See* Doc. 68. On a Rule 12(b)(6) motion, a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). Accordingly, courts in this district have held that where non-exhaustion is clear from the face of a complaint, a court should dismiss the complaint under Rule 12(b)(6). *See Mateo v. Bristow,* No. 12 Civ. 5052(RJS), 2013 WL 3863865, at *3 (S.D.N.Y. July 16, 2013) (citing *Kasiem,* 756 F.Supp.2d at 575; *McCoy v.. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)). However, where non-exhaustion is not clear from the face of the complaint, courts should convert a Rule 12(b) motion into a Rule 56 motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about ... whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* (quoting *McCoy,* 255 F.Supp.2d at 251). Before converting a Rule 12(b)(6) motion into a Rule 56 motion, courts must notify the parties and "afford [them] the opportunity to present supporting material." *Id.* (quoting *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000)). Such notice and

opportunity are "especially important when a plaintiff is *pro se." Id.* (quoting *McCoy,* 255 F.Supp.2d at 251).

**\*4** Here, non-exhaustion is not clear from the face of Plaintiff's complaint. Accordingly, the Court must convert the current motion to one for summary judgment and look to extrinsic evidence. Before converting the motion, however, the Court must determine whether Plaintiff has been given "unequivocal notice" of his obligation to submit evidentiary materials and an opportunity to do so. *See McCoy,* 255 F.Supp.2d at 255.

The Court finds that Plaintiff has been given both notice and opportunity. First, Defendants moved to dismiss specifically on the ground of failure to exhaust and notified Plaintiff that the Court might choose to treat the motion to dismiss as one for summary judgment, and that to oppose it, he would need to submit evidence, such as affidavits. Doc. 67 (Notice to Pro Se Litigant); *see Kasiem,* 756 F.Supp.2d at 575 (holding that formal notice of conversion was not necessary where defendants attached as exhibits to their motion the records they had of plaintiff's grievances and appeals and notified plaintiff that the court might treat the motion to dismiss as one for summary judgment and that plaintiff must therefore submit evidence to oppose the motion); *see also McCoy,* 255 F.Supp.2d at 255–56 (holding that formal notice was not necessary where defendants moved to dismiss specifically on the ground of exhaustion and where plaintiff directly addressed exhaustion in his opposition papers and referred the court to documentary evidence). Additionally, in his opposition papers, Plaintiff directly addresses the issue of exhaustion and refers the Court to documentary evidence, including a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," attached to his brief as exhibits. *See* Doc. 80. Accordingly, the Court finds that Plaintiff had "unequivocal notice" that the Court might convert Defendants' motion to dismiss to one for summary judgment and that Plaintiff had the opportunity to submit extrinsic materials pertinent to that issue.

### c. Plaintiff did not Exhaust Administrative Remedies with Respect to his Claim of Deliberate Indifference to his Medical Needs

Defendants argue that Plaintiff has not exhausted administrative remedies with respect to his claim of deliberate medical indifference because his grievance does not contain any allegations regarding Plaintiff's medical

2013 WL 4774731

care; rather, Plaintiff's grievance only alleges that he was subjected to excessive force by several of the Defendants. Accordingly, Defendants argue that Plaintiff's grievance failed to " 'alert[ ] the prison to the nature of the wrong for which redress is sought,' " thereby failing to afford it "time and opportunity to address [his] complaints internally before allowing the initiation of a federal case." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524–25; *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)).

The Second Circuit has held that "a claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated." *Percinthe v. Julien,* No. 08 Civ. 893(SAS), 2009 WL 2223070, at *4, *4 n. 9 (S.D.N.Y. July 24, 2009) (citing *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (holding that the plaintiff's claim for denial of medical care was exhausted by a grievance alleging excessive force and retaliation, explaining, "while Espinal's grievance ... does not explicitly discuss the misconduct by medical personnel which is alleged in the complaint, it is clear that the State considered these allegations when reviewing Espinal's grievance," because denial of medical care was addressed in the grievance's denial)). Ultimately, the question for the Court is "whether [the] plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond" that alleged against the individual or individuals specifically named in the grievance. *Id.*

**\*5** Here, Plaintiff's grievance merely alleges that he was subjected to excessive force by Defendants Surprenant, Rodriguez, Tillotson, Brothers, Krein, and Kowalchuk;[4] it does not allege that Defendants were deliberately indifferent to Plaintiff's medical needs. *See* Hale Decl., Ex. A. Indeed, the *only* reference in the grievance to Plaintiff's medical care is his allegation that on September 29, 2011, he was taken to Westchester Medical Center "for a cat scan for [his] left eye and a broken nose." *Id.* The Court also notes that Plaintiff's subsequent communications with prison officials regarding his grievance failed to mention any allegations of deliberate indifference to Plaintiff's medical needs. For example, in a December 26, 2011 letter to DOCCS' employee Teri Thomas, Plaintiff refers to his grievance as a "grievance of assault." *Id.* Similarly, in a January 14,

2012 letter to Karen Bellamy, Director of the IGP, regarding the status of his grievance, Plaintiff states that he "was assaulted in Green Haven Facility on 9/27/11" and makes no mention of Defendants' alleged denials of his requests for medical care. *Id.* Moreover, the Court's review of Plaintiff's grievance file indicates that the State did not investigate Plaintiff's allegation of deliberate indifference.[5] Indeed, the grievance file contains memoranda specifically regarding the alleged use of force by only those Defendants actually named in Plaintiff's grievance. Accordingly, the Court finds that Plaintiff's grievance did not "sufficiently alert[ ] prison officials that [Plaintiff] was alleging some wrongdoing beyond" the allegation that he was subjected to excessive force by Defendants Surprenant, Kowalchuk, Brothers, Krein, Tillotson, and Rodriguez.

4    The grievance mistakenly refers to Defendants Krein, Kowalchuk and Surprenant as "Keran," "Wallchuck" and "Suprintnay," respectively.

5    As Defendants mention in their motion papers, a September 27, 2011 memorandum from Defendant Surprenant to Defendant Lee regarding the incident states that "RN Miller reported to PSU to conduct the medical exam of inmate Hilbert in the cell. Swelling to his left eye and a small abrasion on the right arm was reported on the medical exam. All injuries were deemed minor in nature and the inmate remained in MH–OB–004 on the 1 to 1 watch." Hale Decl., Ex. A. Defendant Surprenant's reference to Plaintiff's medical examination and status immediately following the alleged excessive use of force does not suggest that the State investigated Plaintiff's claim of deliberate indifference. Moreover, Defendant Surprenant's description of Plaintiff's medical exam by Defendant Miller would not put the State on notice of any potential allegations regarding Defendants' alleged refusal of Plaintiff's requests for medical care. Additionally, Plaintiff's grievance file includes the medical report by Defendant Miller, dated September 27, 2011, describing the nature of Plaintiff's injuries. That report, however, also does not suggest that the State investigated or considered Plaintiff's claim of deliberate indifference; nor would the report have put the State on notice of such a claim.

Moreover, the Court finds that none of the three exceptions to the exhaustion requirement articulated by the Second Circuit in *Hemphill,* 380 F.3d at 686, are applicable to Plaintiff's case. First, administrative remedies were clearly "available" to Plaintiff, as he filed

2013 WL 4774731

a grievance at Marcy on December 8, 2011, which was subsequently investigated by the Inspector General's Office. Hale Decl., Ex. A. Second, Defendants have not forfeited the affirmative defense of non-exhaustion, nor are they estopped from asserting it. Estoppel is found where "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." *Winston v. Woodward,* No. 05 Civ. 3385(RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (citations omitted). As such, the Second Circuit has held that a plaintiff's non-exhaustion may be excused on the grounds of estoppel where the plaintiff was misled, threatened or otherwise deterred from fulfilling the requisite procedures. *Id.* (citing *Hemphill,* 380 F.3d at 688–89; *Ziemba v. Wezner,* 366 F.3d 161, 163–64 (2d Cir.2004)). Here, Plaintiff does not allege that Defendants improperly deterred him from filing a grievance regarding the alleged deliberate indifference, and the record does not evidence the existence of any such threats or misconduct on the part of Defendants.

**\*6** With respect to the third exception, the Second Circuit has held that "there are certain 'special circumstances,' " such as a reasonable misunderstanding of grievance procedures, "in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). While Plaintiff does not specifically allege any "special circumstances" justifying his failure to exhaust administrative remedies, he states in his opposition papers that he "was told that his grievance was untimely" when he attempted to file it at Marcy, and that he believed he had "taken all the proper steps" by filing a complaint "with risk management at CNYPC [Central New York Psychiatric Center] for the excessive force claim and medical negligence." PL's Affirmation in Support of Motion (Doc. 78); *see also* PL's Mem. L. Opp. 6 (stating that Plaintiff filed a complaint concerning his "medical issues" with the risk management office at CNYPC on October 14, 2011). In light of its obligation to interpret Plaintiff's submissions as raising the strongest arguments that they suggest, *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006), the Court will treat Plaintiff's argument regarding his failure to exhaust administrative remedies as a request to excuse his non-exhaustion under the third *Hemphill* exception.

A review of the grievance file indicates that Plaintiff remained at Green Haven until October 13, 2011, where he was in a psychiatric observation cell in the Mental Health Unit and did not have access to any writing tools. Hale Deck, Ex. A. Plaintiff was then transferred to CNYPC, where he claims to have filed a complaint with "risk management." *Id.* After Plaintiff returned to Marcy on December 8, 2011, his grievance regarding the September 27, 2011 assault was rejected as untimely. *Id.* However, after prison officials confirmed that Plaintiff did not have access to the grievance process while at Green Haven and determined that he had shown "mitigating circumstances," Plaintiff's grievance was filed at Marcy on January 27, 2012. *Id.* Accordingly, the record indicates that despite initially being informed that his grievance was untimely, Plaintiff was ultimately permitted to file his grievance upon his return to Marcy.

Moreover, to the extent that Plaintiff argues that his attempt to file a complaint while at CNYPC constitutes a "special circumstance" justifying his failure to exhaust administrative remedies, the Court disagrees. First, Plaintiff failed to provide the Court with a copy of the complaint that he allegedly filed at CNYPC, and the declaration of Jeffery Hale, Assistant Director of the IGP for DOCCS, states that after conducting a "diligent search for grievances and appeals filed by [Plaintiff] based on grievances filed at the facility level," Mr. Hale determined that Plaintiff "did not file a grievance alleging that defendants were deliberately indifferent to his medical needs while at Green Haven in September 2011." Hale Decl. ¶ 10. Plaintiff's unsupported allegation that he filed a grievance at CNYPC is insufficient to withstand a motion for summary judgment. *See Santiago v. Murphy,* No. 08 Civ.1961(SLT), 2010 WL 2680018, at *2–*3 (E.D.N.Y. June 30, 2010) (dismissing complaint where declarations submitted by defendant stated that there was "no record of any grievance" for the alleged incident and holding that plaintiff's unsupported allegation that he filed a grievance is insufficient to withstand a motion for summary judgment). Second, even assuming that Plaintiff did file a complaint with the risk management office at CNYPC, that complaint was clearly not exhausted. The IGP requires that inmates file grievances "with an IGP clerk." 7 NYCRR § 701.2(a); *see also id.* §§ 701.4(g), 701.5. Accordingly, Plaintiff's complaint to the risk management office was not properly filed. Additionally, Plaintiff does not assert that he appealed from the

2013 WL 4774731

denial of that grievance, nor is there any record of such appeal. *Santiago,* 2010 WL 2680018, at *3. Finally, even if at the time of allegedly filing his complaint at CNYPC Plaintiff misunderstood the grievance procedure, his failure to exhaust administrative remedies would still not be justified. Upon his return to Marcy, Plaintiff clearly had an understanding of the grievance procedure sufficient enough to allow him to properly file a grievance regarding the excessive force allegation in accordance with the IGP. Plaintiff has provided the Court with no explanation to justify his failure to include in that grievance the allegation regarding Defendants' alleged deliberate indifference to his medical needs. Accordingly, as the record establishes that Plaintiff is aware of and has shown that he is capable of following the correct grievance procedure, the Court finds that he has failed to demonstrate the existence of "special circumstances" sufficient to excuse his non-exhaustion.[6] *See Kasiem,* 756 F.Supp.2d at 577–78 (holding that the plaintiff failed to demonstrate the existence of "special circumstances" justifying his non-exhaustion where he had previously shown that he was capable of following the correct grievance procedure).

[6]    The Court notes that the exhibits attached to Plaintiffs' opposition papers, which include a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," do not compel a different outcome, as they do not go to the issue of exhaustion.

**\*7** The Court therefore finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate medical indifference claim and that none of the three exceptions to the exhaustion requirement apply. Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Prisoners have 21 days from the date of the alleged occurrence to initiate the first formal step of the IGP, subject to exceptions "based on mitigating circumstances." 7 NYCRR §§ 701.5(a)(1), 701.6(g)(1)(i)(a). However, an exception to the time limit may not be granted if the request is made more than 45 days after the alleged occurrence. 7 NYCRR § 701.6(g) (1) (i)(a). Accordingly, because the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance with respect to his deliberate indifference claim, the claim is dismissed

with prejudice.[7] *See Santiago,* 2010 WL 2680018, at *3 (dismissing complaint with prejudice because "[a]ny grievance or appeal would now be untimely under 7 NYCRR § 701.5, and the time limit for seeking an exception to the time limitations under 7 NYCRR § 701.6 has also passed"); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 240 (W.D.N.Y.2010) (dismissing complaint with prejudice where the time limits for plaintiff to file an administrative appeal had long since passed and plaintiff did not allege "any facts excusing his failure to exhaust").

[7]    The Supreme Court has held that the PLRA does not require dismissal of an entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. *Jones,* 549 U.S. at 223–24. Accordingly, although the Court finds that Plaintiff's deliberate indifference claim should be dismissed for non-exhaustion, his remaining exhausted claims may proceed.

**d. Fischer and Lee are Dismissed as Defendants**
Defendants move in the alternative to dismiss the Amended Complaint against Defendants Fischer and Lee. Plaintiff's sole allegation with respect to these Defendants relates exclusively to his deliberate medical indifference claim. *See* Am. Compl. ¶ 5. Accordingly, because the Court finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate indifference claim, Defendants' motion to dismiss with respect to Defendants Fischer and Lee is granted.

Moreover, to the extent that Plaintiff seeks to hold Defendants Fischer and Lee liable for his excessive force claim, that claim is also dismissed against them. Case law is clear that supervisors may not be held vicariously liable for their subordinates' violations. *See Rahman v. Fisher,* 607 F.Supp.2d 580, 584–85 (S.D.N.Y.2009). It is therefore "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Id.* at 585 (citation omitted). Neither the factual allegations contained in the Amended Complaint nor the grievance file submitted by Defendants indicate that Defendants Fischer or Lee were "personally involved" in the alleged violation, either by directly participating in it or by failing to stop it. Although a review of Plaintiff's grievance file indicates that Defendant Lee received a memorandum from Defendant Surprenant regarding the

alleged excessive use of force, case law is clear that "[a]fter the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation." *Id.*

### III. Conclusion

**\*8** For the reasons set forth above, Defendants' partial motion to dismiss is GRANTED. Accordingly, Plaintiff's First Cause of Action for Deliberate Indifference to an Inmate's Medical Needs in Violation of the Eighth and Fourteenth Amendments is DISMISSED with prejudice. [8] The only remaining claims are those for unnecessary and excessive use of force in violation of the Eighth Amendment; violations of the Americans with Disabilities Act; and violations of the Rehabilitation Act. The only remaining Defendants in this action are Surprenant, Tillitson, Brothers, Krein, Kowalchuk, and Rodriguez.

[8]    Although Defendants Santoro, Krein and Rodriguez did not join in Defendants' partial motion to dismiss, because the Court finds that Plaintiff failed to exhaust administrative remedies with respect to his deliberate medical indifference claim, that claim is dismissed as to those Defendants as well.

The Clerk of the Court is respectfully directed to terminate the motions. Docs. 65, 77. The parties are directed to appear for a status conference on October 2, 2013 at 9:30 am.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4774731

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31040370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Maurice SAMUELS, Plaintiff,

v.

Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery
McCoy, and Christopher P. Artuz, Defendants.

No. 01CIV.8235(AGS).
|
Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at
the Green Haven Correctional Facility, [1] prison officials
searched his cell and confiscated a number of documents
which were deemed to be "subversive" and contraband.
Samuels claims that the materials, including theological
textbook excerpts, were of a Christian nature and were
used in a course he taught in the prison through the New
York Theological Seminary. Samuels' alleged possession
of these documents led to a misbehavior report and a
subsequent disciplinary hearing, for which Samuels was
sentenced to 180 days in keeplock and 180 days' loss
of packages, commissary privileges, and telephone use.
Samuels also alleges that instead of being punished as
per his disciplinary hearing, he was sentenced to a more
severe punishment, 180 days in a special housing unit
which entailed Samuels' being locked in his cell for twenty-
three hours per day. On the basis of the allegedly unlawful
sanctions to which he was subjected, Samuels has filed
the instant action pursuant to 42 U.S.C. § 1983 alleging
violations of, *inter alia,* his First Amendment and due
process rights, and seeks equitable relief and damages.
Defendants have filed a motion to dismiss the action
pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue
that they enjoy qualified immunity barring this suit. For
the reasons set forth below, defendants' motion is granted
in part and denied in part.

[1] Defendants repeatedly state that the events giving rise
to this action arose while Samuels was incarcerated
at the Great Meadow Correctional Facility. Samuels
states that the events in question happened at
the Green Haven Correctional Facility. Moreover,
Samuels' evidence, including the Inmate Disciplinary
Report (Exhibit H), the Disciplinary Hearing Record
Sheet (Exhibit O), and the Superintendent Hearing
Disposition Report (Exhibit P) all note the Green
Haven Correctional Facility. In light of the above,
the Court determines that defendants' position that
the events occurred at Great Meadow is incorrect.
The Green Haven Correctional Facility is located
in Dutchess County in the Southern District, while
Great Meadow is located in Washington County in
the Northern District. Defendants make no argument
regarding the Court's jurisdiction with respect to the
location of the events in question.

II. Factual Background [2]

[2] Unless otherwise indicated, the facts set forth below
are gleaned from Samuels' submissions, because
on a FED. R. CIV. P. 12(b)(1) or (6) motion,
the adjudicating court must assume as true factual
allegations made in the complaint. Defendants
concede this fact. *See* Defendants' Memorandum
of Law in Support of their Motion to Dismiss
the Complaint, at 4. It should also be noted
that Samuels brings this action *pro se.* As such,
it is sometimes difficult to understand fully his
contentions. Accordingly, the Court reads the
(sometimes confusing) factual allegations in the light
most favorable to Samuels.

Maurice Samuels is currently an inmate at the Sullivan
Correctional Facility. Since being incarcerated, Samuels
has taken a keen interest in religion. He identifies himself
as a member of the Five Percent Nation of Gods
and Earths. [3] While confined at Sing Sing, he received
a degree of Master of Professional Studies in Prison
Ministry through the New York Theological Seminary
("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section
1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon
completion of his studies with the NYTS, Samuels was
transferred to the Green Haven Correctional Facility. [4] At
Green Haven, Samuels was assigned a clerk's position in
therapeutic "Reality and Pain Program." He subsequently
redesigned the program, creating the "Reality and Pain
Therapeutic Counseling Program." *See* Complaint, at 4.
During this period he also served as a volunteer inmate
instructor in the Black Studies program, and was later

assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

[3]   The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divi nity.uchicago.edu/sightings/archive_1999/ sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

[4]   *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

 **2**  a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing

subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

[5]     While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

[6]     The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

 **\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR

for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

7     *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

8     Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre, [10] summarized his findings as follows:

9     Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

10    The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days. [11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"), at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the

2002 WL 31040370

special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

11    Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[13] *See id.*

12    Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

13    No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

14    In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

### III. Legal Standard

#### A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief.' " *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to

"raise the strongest arguments that they suggest." *Weixel, 287 F.3d at 146* (quoting *McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999)* (internal quotation marks omitted)).

### B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc., 189 F .3d 165, 169 n. 3 (2d Cir.1999); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.1997).* In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York, 286 F .3d 122, 125 (2d Cir.2002); Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir.1998).* While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York, 286 F.3d at 125* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)*).

### IV. Legal Analysis

#### A. Exhaustion of Administrative Remedies

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle, 122 S.Ct. 983 (2002).* The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id. at 988.*

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

> [T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

## 2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at 8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this

may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

[15] The real damage suffered by Samuels was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002),* is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

> To require [plaintiff] to file an administrative grievance in these

circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [§ 1997e(a) ][16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

16    The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing

of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing. [17]

17    The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special housing unit for 180 days.

3. Special Housing Unit Confinement
Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies. [18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

18    There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit.

2002 WL 31040370

The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at *2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

### 4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

### 5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001).

However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

### B. Due Process

#### 1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at *22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." ' *Walker,* at *21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at *21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at *21.

[19]    As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at *22. In light of these facts, and given

the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d 532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:
(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him
Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-

page affidavit by Inmate Grievance Program Director Thomas E. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' ' *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

a. Witnesses
**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [20] Dismissal is therefore inappropriate.

[20]    Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

### b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

### c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the "limited" assistance to which Samuels is entitled. [21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

21  By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

### d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

### e. Timeliness of the Hearing

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated. The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

### f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

### C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for

2002 WL 31040370

two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

### D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

### 1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

### 2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

[22]   Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his supervisor.

### 3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

### 4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

### 5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

### 6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this

2002 WL 31040370

office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

### 7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

### 8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

### E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

### V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 31040370

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 122921
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dennis FLANAGAN, Plaintiff,

v.

J. MALY, Captain at Downstate Corr. Fac., A.
Sedlak, Sergeant at Downstate Corr. Fac., P. Artuz,
Corr. Officer at Downstate Corr. Fac ., S. KIERNAN,
Corr. Officer at Downstate Corr. Fac., J. Whalen,
Corr. Officer at Downstate Corr. Fac., D. Alfonso,
Corr. Officer at Downstate Corr. Fac., Individually
and in their Official Capacity, Defendants.

No. 99 CIV 12336 GEL.
|
Jan. 29, 2002.

**Attorneys and Law Firms**

Dennis Flanagan, for Plaintiff Dennis Flanagan, pro se.

Eliot Spitzer, Attorney General of the State of New York
(Melinda Chester–Spitzer, Assistant Attorney General of
the State of New York,), for Defendants J. Maly, A.
Sedlak, P. Artuz, S. Kiernan, J. Whalen, D. Alfonso, of
counsel.

*OPINION AND ORDER*

LYNCH, J.

**\*1** Dennis Flanagan, a New York State prisoner, brings
this action against a number of corrections officers at
Downstate Correctional Facility, where he was formerly
incarcerated, charging that they violated his constitutional
rights. Specifically, he alleges that all the defendants
except John Maly used excessive force against him in an
altercation on June 4, 1999; that Maly, who conducted a
disciplinary hearing on charges brought against Flanagan
as a result of that incident, denied him due process of law;
and that the defendants collectively denied him access to
medical care and to the law library. Defendants move for
dismissal of the complaint and/or summary judgment, on
a variety of grounds. The motion is granted in substantial
part as to all claims except the excessive force claim, as
to which proceedings will be stayed pending the Supreme
Court's decision in *Porter v. Nussle,* 122 S.Ct. 455 (2001).

The facts underlying plaintiff's claims will be addressed, to
the extent necessary, in the discussion of the defendants'
various arguments.

*DISCUSSION*

I. *Exhaustion of Administrative Remedies*
Defendants argue that the entire complaint should be
dismissed for failure to exhaust available administrative
remedies as required by 42 U.S.C. § 1997a(e), which
provides:

> No action shall be brought with
> respect to prison conditions under
> section 1983 of this title, or any
> other Federal law, by a prisoner
> confined in any jail, prison, or
> other correctional facility until
> such administrative remedies as are
> available have been exhausted.

A. *Medical and Legal Needs*
Unquestionably, Flanagan's claims about inadequate
access to medical care and legal materials are complaints
about "prison conditions" within the meaning of this
statute. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d
435, 439–440 (S.D.N.Y.2000) (deliberate indifference
to medical needs and access to courts are "prison
conditions"); *Cruz v. Jordan,* 80 F.Supp.2d 109
(S.D.N.Y.1999) (deliberate indifference to medical needs
are "prison conditions"); *Carter v. Kiernan,* 2000 WL
760303 (S.D .Y. June 12, 2000) (same). Equally
unquestionably, Flanagan has failed to exhaust available
administrative remedies with respect to those claims.

New York permits inmates to file internal grievances as
to virtually any issue affecting their confinement. *See*
N.Y. Corr. Law § 139 (authorizing inmate grievances);
7 N.Y.C.R.R. § 701.7 (establishing procedures for
processing such grievances); *Petit v. Bender* 2000 U.S.
Dist LEXIS 3536 at *6–8 (S.D.N.Y. March 22, 2000)
(describing procedures); *Vasquez v. Artuz,* 1999 WL
440631 at *5 (S.D.N.Y. June 28, 1999) (same).

Prison records show no written grievances filed by
Flanagan with respect to his medical or legal access.

(Hughes Aff. Ex. BB at 4 ¶ 13.) Flanagan essentially concedes that he filed no such written grievance. [1] He does contend that he made an oral complaint to both the area supervisor, Sergeant Sedlak, (Pl.'s Br. at 3 ¶ 10), and a grievance supervisor, Skip Hughes –contentions which both officers deny (Sedlak Aff. Ex. G at 7 ¶ 26; Hughes Aff. Ex. BB at 4 ¶ 17).

[1]    Flanagan states under oath that he submitted a "verbal grievance" to Sergeant Sedlak and "another verbal grievance" to supervisor Hughes who "ignored" his complaint. (Flanagan Aff. ¶¶ 3–4; Pl.'s Br. 1.) Although Flanagan's brief opposing summary judgment later states that "plaintiff did file a written grievance," the remainder of the same sentence suggests that he unintentionally omitted the word "not," as plaintiff proceeds to explain why an oral grievance should be considered the equivalent of a written grievance. (Pl.'s Br. 8.) Evaluating this in conjunction with Flanagan's affidavit, which nowhere states that he made a written complaint, it is clear that Flanagan is not claiming to have made a written report.

**\*2** But even if Flanagan made oral complaints or filed a written report of some kind, that would not satisfy the statutory requirement. To comply with 1997a(e), a prisoner must "exhaust[ ]" his administrative remedies, meaning that he must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing his suit. *Sonds v. St. Barnabas Hosp. Corr. Health Serve.,* 2001 U.S. Dist. LEXIS 7839 at *4 (S.D.N.Y. May 21, 2001); *Santiago,* 89 F.Supp.2d at 438, 438. The New York procedures provide for the filing of a written grievance, 7 N.Y.C.R.R. § 701.7(a)(1), and continuing through several levels of administrative appeal, 7 N.Y.C.R.R. § 701.7(a)(4), (b), and (c). The record demonstrates that Flanagan was fully aware of the availability of these grievance procedures. They are described in a booklet provided to all inmates on arrival, (Defs.' Br. 15), and Flanagan himself filed grievances over other issues. [2] Flanagan does not claim, let alone provide any evidence, that he pursued his grievance through these channels. [3]

[2]    Prison records indicate that Flanagan filed a written grievance regarding the prison food served in the

Downstate Correctional Facility. (Hughes Aff. Ex. BB at 4 ¶¶ 13, 17; Ex. CC.)

[3]    As previously stated, Flanagan claims that he submitted only verbal grievances to complaint supervisor Hughes and defendant Sedlak, who reacted with hostility to the complaint and threatened plaintiff with violence if he continued to complain. (Pl.'s Br. at 1, 6, 8–9; Flanagan Aff. ¶ 3.) No doubt, under some circumstances, behavior by prison officials that prevented a prisoner from complying with § 1997a(e) would excuse compliance. But Flanagan alleges nothing approaching conduct that would present this issue. He evidently made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance.

Accordingly, Flanagan's claims of deliberate indifference to his medical needs and denial of access to the law library must be dismissed for failure to exhaust administrative remedies.

  B. *Due Process*

Flanagan's due process claim, in contrast, cannot be so easily dismissed on exhaustion grounds. Flanagan argues that in conducting his disciplinary hearing, which resulted in a sentence of 24 months in Special Housing and various other administrative sanctions, Maly denied him due process by denying him the right to call a witness and to introduce certain medical records. Flanagan appealed this decision internally, to no avail. (Spitzer Decl. Ex. X.)

To require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

2002 WL 122921

Defendants essentially concede as much. Although their brief asserts that Flanagan's entire "action" should be dismissed for failure to exhaust (Defs.' Br. 13), the brief goes on to argue extensively for such dismissal of the medical and legal access claims (*id.* 14–16), and of the excessive force claim (*id.* 16–21), without directing any argument toward the exhaustion of the due process claim. [4]

[4]  The exhaustion rule does require a plaintiff to have appealed his disciplinary case to the fullest extent provided by administrative regulations. *Sonds,* 2001 U.S. Dist. LEXIS 7830 at *4. It is not entirely clear on this record that Flanagan did. Given that (1) it is clear that Flanagan unsuccessfully pursued some appeal of the result of his hearing, (2) defendants have not pointed out any further levels of appeal available to him that he failed to utilize, and (3) the due process claim must be dismissed on the merits in any event, there is no need to pursue further clarification of the matter.

**\*3**  For these reasons, the motion to dismiss the due process claim for failure to exhaust administrative remedies must be denied. [5]

[5]  Flanagan's complaint, construed liberally as pro se pleadings must be, also appears to claim that certain defendants conspired to file false reports against him. (Compl.¶¶ 21–22.) Defendants do not address an exhaustion argument specifically to this claim. Arguably, the same logic set out above as to the due process claim would permit the conclusion that, by contesting the reports at his hearing and exhausting his appeals, Flanagan has exhausted his remedies as to this claim as well. Assuming without deciding that the exhaustion requirement has been met, this claim must nevertheless be dismissed for failure to state a claim, since a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986); *see also Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997), and there is no claim here that the false report constituted retaliation for exercise of a constitutional right, rather than simply a rationalization for the use of allegedly excessive force. *Cf. Franco v. Kelly* 854 F.2d 584, 588 (2d Cir.1988).

C. *Excessive Force*

Flanagan's excessive force claim also survives the defendants' exhaustion argument. The claim that individual officers assaulted an inmate on a particular occasion does not fit easily within the ordinary meaning of "[an] action ... with respect to prison conditions," and the Second Circuit has ruled that such a complaint is not subject to the exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000).

Defendants structure much of their argument against the excessive force claim as an attack on the Second Circuit's decision in *Nussle,* recommending that this Court, in effect, overrule *Nussle* from below. Defendants' arguments that *Nussle* was wrongly decided are appropriately addressed only to higher authority – and have been. The Supreme Court has granted certiorari in *Nussle. Porter v. Nussle,* 122 S.Ct. 455 (2001). [6] While that Court's recent decision in *Booth v. Churner,* 121 S.Ct. 1819 (2001), suggests that the Court might reverse, until and unless it does, *Nussle* remains the law of this circuit, and requires denial of defendants' motion to dismiss the excessive force claim.

[6]  Indeed, New York's Attorney General has himself presented his arguments for reversal of *Nussle* in an amicus brief in that case. *See* Brief of Amici Curiae New York, *et al., Porter v. Nussle* (No. 00–853), 122 S.Ct. 455 (2001).

II. *Summary Judgment*

Defendant Maly moves in the alternative for summary judgment on Flanagan's due process claim. That motion will be granted.

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and

2002 WL 122921

that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." Scotto, 143 F.3d at 114 (quoting Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir.1998); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Pocchia v. NYNEX Corp., 81 F.3d 275, 277 (2d Cir.1996) (quoting Liberty Lobby, 477 U.S. at 252).

**\*4** It is settled that the "[p]rocedures established by the New York Department of Correctional Services governing disciplinary hearings comport with the due process procedural rights to which prison inmates are entitled." Rodriguez v. Ghoslaw, 2001 WL 755398 at \*9 (S.D.N.Y. July 5, 2001), citing Walker v. Bates, 23 F.3d 652, 656 (2d Cir.1994). Flanagan nevertheless claims that Maly deprived him of due process by evidentiary rulings made during the hearing.

The facts relating to these claims are essentially undisputed, and on those facts no denial of due process can be found. Flanagan offers no evidence to dispute Maly's testimony that the witness Flanagan sought to call, an inmate named Sanabria, refused to testify at the hearing. (Spitzer Decl. Ex. U at 24.) Indeed, upon learning that Sanabria would not appear at the hearing, Maly went to Sanabria's cell to inquire further, and Sanabria again refused. [7] (Id. at 25; Spitzer Decl. Ex. V at 19.) It is thus not true that Maly precluded a relevant witness from testifying.

[7]    Sanabria told Maly he would not testify because he had been threatened by a corrections officer named Lee. There is, of course, no admissible evidence that this was so, Sanabria's statement being hearsay. But even if such a threat had occurred, nothing in the record casts doubt on Maly's testimony that he reassured Sanabria that his safety would be guaranteed if he testified, as three other inmates,

including Flanagan, did. (Maly Aff. Ex. U at ¶¶ 25–26.)

As for the documentary evidence, Maly refused to admit photographs taken of Flanagan on the date of the incident, which Flanagan asserted would show that his hands were not bruised, arguably tending to show that he had not assaulted a corrections officer as charged. Maly ruled the photos irrelevant. The photographs were of limited probative value, and while the better course might have been to admit them, it can hardly be said that their exclusion was prejudicial error, let alone that it rises to the level of a denial of due process.

Maly heard testimony from Flanagan and two inmate witnesses, as well as from three corrections officers and the nurse who treated Flanagan and the officers after the fight. He also reviewed various medical records. The hearing provided Flanagan an opportunity to be heard "at a meaningful time and in a meaningful manner," Mathews v. Eldridge, 424 U.S. 319, 333 (1976), and thus comported with the requirements of due process. At a minimum, Maly is entitled to qualified immunity against Flanagan's claims, since his conduct of the hearing did not violate any "clearly established statutory or constitutional right," Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir.1993); see also Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir.1989), as established by Supreme Court or Second Circuit precedent, Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir.1991).

Accordingly, Maly's motion for summary judgment must be granted.

III. *Stay of Proceedings*
Defendants do not seek summary judgment on the one remaining claim, for the alleged use of excessive force. Nor could they successfully do so, since the parties' conflicting testimony as to the events precipitating the use of force and the degree of force used presents classic questions of fact for jury resolution. [8] Accordingly, Flanagan's excessive force claim can proceed to trial.

[8]    The only one of defendants' remaining arguments that applies to this claim is their weakly-presented contention that the Court lacks jurisdiction under the Eleventh Amendment to the extent that they are sued in their official capacities. (Defs.' Br. at 39–40.) However, according Flanagan's complaint the liberal

2002 WL 122921

construction to which he is entitled, it is clear that he means to assert an ordinary claim that defendants as individuals violated his rights under color of state law.

It would be imprudent, however, to schedule a trial at this time, in view of the pending Supreme Court decision in *Nussle.* Oral argument has already been heard, and a decision is likely within a few months. If the Supreme Court reverses and holds that exhaustion of administrative remedies is required in excessive force cases, Flanagan's one remaining claim will have to be dismissed, and any additional proceedings in this matter will have been wasted. If the Court affirms, in contrast, neither party will have been prejudiced by a brief delay. Therefore, proceedings in this case will be stayed pending the Supreme Court's decision.

### CONCLUSION

**\*5** For the reasons set forth above, plaintiff's claim that defendants deprived him of access to medical care and to the courts are dismissed for failure to exhaust administrative remedies. Plaintiff's claim that defendants conspired to file false disciplinary reports is dismissed for failure to state a claim on which relief can be granted. Summary judgment for defendant Maly is granted on plaintiff's claim that he was denied due process of law at his disciplinary hearing; since this is the only claim against Maly, the case is terminated as to him.

The remaining defendants' motions to dismiss or for summary judgment with respect to plaintiff's claim of excessive force are denied, and further proceedings on that claim are stayed pending the Supreme Court's decision in *Porter v. Nussle.*

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 122921

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00425-DNH-TWD    Document 26    Filed 12/04/17    Page 96 of 106
Murray v. Palmer, Not Reported in F.Supp.2d (2010)
2010 WL 1235591

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

[1]     *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

[2]     The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

 **\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

[3]     *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

[4]     7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez*

*v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5     *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies,

plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6     *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

    A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); see also N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir.2006) (citing Porter, 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004), accord, Ruggiero, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." Hemphill, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Id. [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." Id. [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. Giano v. Goord, 380 F.3d 670, 678-79 (2d Cir.2004); Johnson v. Testman, 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim in question was grievable,[11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

[7]     The Court recognizes that the Supreme Court's decision in Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in Woodford, the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. Woodford, 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, as a prerequisite to bringing suit in federal court. Id. at 88-103 (emphasis added). It is unclear whether Woodford has overruled

any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10    *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007)

(McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11    *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12    *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13    *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14    *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question].", *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15    *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied

his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16      See, e.g., Colon v. Furlani, 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; Cassano v. Powers, 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

*4  Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. See, e.g., Sease v. Phillips, 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

17      See Hemphill, 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner

plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); Verley v. Wright, 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); Winston v. Woodward, 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under Hemphill of demonstrating 'special circumstances' "; see also Ramirez v. Martinez, 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); Washington v. Proffit, 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue

for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[22]

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating

to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law.

2010 WL 1235591

The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22   *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied, ---U.S. ----,* 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims,

and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

 *5  New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during

2010 WL 1235591

the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

[23]    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

[24]    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number

GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

[25]    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

[26]    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008)

Case 9:17-cv-00425-DNH-TWD    Document 26    Filed 12/04/17    Page 105 of 106

(Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koeingsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004)* ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone

employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

**C. Special Circumstances**

*6 There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was

not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

[27]   *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

[28]   The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a

letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7**   For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.